# Supreme Court of Florida

_____

No. SC14-1629
_____

**RODOLFO VALLADARES,**
Petitioner,

vs.

**BANK OF AMERICA CORP., etc.,**
Respondent.

[June 2, 2016]

LEWIS, J.

This case is before the Court to review the decision of the Third District Court of Appeal in Bank of America Corp. v. Valladares, 141 So. 3d 714, 715 (Fla. 2014). This case concerns a falsely reported robbery that resulted in injuries to Petitioner Rodolfo Valladares. The issue we must address today is whether those who falsely report criminal conduct to law enforcement have a privilege or immunity from civil liability for the false report. This issue implicates both police officer and citizen safety concerns. Valladares asserts that the decision of the Third District Court of Appeal expressly and directly conflicts with Pokorny v. First Federal Savings & Loan Ass'n of Largo, 382 So. 2d 678 (Fla. 1980). Further,

the district court decision expressly disagreed with and rejected the decision in Harris v. Lewis State Bank, 482 So. 2d 1378 (Fla. 1st DCA 1986). We conclude that the decision below is in conflict with both Pokorny and Harris. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We hold that a cause of action is available to one injured as a result of a false report of criminal behavior to law enforcement when the report is made by a party which has knowledge or by the exercise of reasonable diligence should have knowledge that the accusations are false or acts in a gross or flagrant manner in reckless disregard of the rights of the party exposed, or acts with indifference or wantonness or recklessness equivalent to punitive conduct.

## FACTS AND PROCEDURAL BACKGROUND

### The Falsely Reported Robbery

On the morning of July 3, 2008, an e-mail was circulated in the Williams Island branch of Bank of America that advised staff to be on the lookout for a bank robber. The e-mail included several photos of a white male wearing a Miami Heat baseball cap, a T-shirt, and sunglasses.

At approximately 3:00 p.m. that same day, Rodolfo "Rudy" Valladares walked into his local Bank of America with the intent to cash a $100 check. Valladares, a Hispanic male, wore a loose-fitting athletic shirt, gym pants, a black Miami Heat baseball cap, and dark sunglasses. Although sunglasses and Miami

Heat attire are not at all uncommon, nor are they significantly descriptive in South Florida, Meylin Garcia believed that Valladares, a Bank of America customer, was the bank robber depicted in the morning e-mail as soon as he entered the bank. At the time, she did not have possession of the e-mail to compare the robber's photos with Valladares's appearance, and the bank had not provided copies of the photos for the tellers' desks. As Valladares approached her desk, without any suspicious conduct, Garcia pushed the silent alarm.

### Failure to Correct the Alarm

Valladares reached Garcia's desk and properly presented her with his check and driver's license. Specifically, the check was a Bank of America check with Valladares's name on it, for which there was absolutely no suspicion. The name on the check matched the name on his driver's license, for which there was also no suspicion. Yet, Garcia still failed to do anything to cancel the robbery alarm. When asked why she did not do anything to cancel the alarm after being presented with the matching check and license, Garcia testified:

> I honestly thought that he was a bank robber at that moment as soon as he walked in . . . . I had it set in my mind according to the description I had seen that morning about the e-mail. As soon as Mr. Valladares walked in the bank, I saw him, and since he was wearing a Miami Heat hat, the sunglasses—I mean I saw him, and automatically I panicked, I got scared.

After accepting the license and the check, Garcia excused herself and informed Valladares that she would return shortly. Valladares had hoped to

- 3 -

complete the transaction without delay because he had $400 worth of food in his car in preparation for a Fourth of July family barbecue the next day.

As these events were occurring, assistant manager trainee Jimmy Alor received a call from corporate security, which asked him to verify the basis for the silent alarm that had been activated from Garcia's teller station. Unaware of any emergency, Alor scanned the area and saw that Garcia had left her desk to speak with another bank employee. He approached them and asked about the silent alarm that had been triggered. Notwithstanding that Garcia already had ample opportunity to examine Valladares's face, check, and driver's license, and that no hint of a robbery was presented, and Alor had ample time to know the true facts, Garcia replied, "the robber is at my window." Alor did not make any inquiry or take any steps to confirm that Valladares was or was not in fact an armed bank robber or a customer because he simply assumed from her body language that she perceived a threat. Alor made only a quick glance toward Garcia's window and saw no suspicious conduct, but he did not attempt to gather or develop any further information. Alor walked back to his desk and, without any confirmation or verification, simply repeated Garcia's words to the corporate security caller: the robber is at her window. When asked by corporate security if the suspect was armed, Alor responded that he had no idea but he had not seen any type of weapon.

Alor then returned to his duties and simply acted as if there were no emergency and ignored what was happening in his bank.

Garcia returned to her position with Valladares. Valladares proceeded to make conversation with Garcia, asking her if she had plans for the Fourth of July holiday, and even invited her to his family barbecue. She replied that she had a boyfriend, to which he responded, "he's welcome to come too." She then studied his license again and looked at Valladares, but still failed to differentiate Valladares's Hispanic characteristics from those of the white male depicted in the e-mail she had seen earlier that day and failed to take any steps to report the innocent transactional facts. Garcia asked Valladares to endorse the check, and handed Valladares a pen.

Garcia left her desk again, with Valladares's check and license in hand, to present them to her manager, Bianca Mercado. In an attempt to further stall the transaction, Garcia returned to her desk and informed Valladares that she could not cash the check because the computers were down. Valladares was confused, as it was apparent that other transactions were still taking place at the bank. He asked to see the manager. When Mercado arrived, Valladares said, "What seems to be the problem? It's just a $100 check, on a Bank of America check. Look at my driver's license." As yet another ruse to confuse Valladares, Mercado replied that they could not cash his check because it was endorsed in the wrong colored ink.

Mercado added that he had to leave the bank immediately. Valladares, understandably, became irritated with the employees' strange and rude behavior. He expressed that he could not believe he was being thrown out of the bank on these grounds, but turned around and started to leave. Approximately fifteen to twenty minutes had elapsed from the time Valladares first presented his check to his attempted exit. Absolutely nothing had occurred, suspicious or otherwise, during the entire time to suggest or hint that Valladares was anything other than a regular bank customer conducting normal banking business.

Garcia confirmed that during the entirety of Valladares's interaction with bank employees, he did not make any threats, present a note, make a demand, or appear in any way to be armed or have a criminal intent. She conceded that Valladares did nothing to elicit any suspicion that he intended to rob the bank or engage in any unlawful behavior. Garcia even agreed that Valladares was very nice to her during their interaction. Garcia simply attempted to insist that at no point during the incident did she doubt that Valladares was the bank robber, notwithstanding all of the facts to the contrary.

As Valladares attempted to exit the bank, he saw a team of police officers armed with heavy weapons emerging from multiple sides of the building. The team was led by Officer Sean Bergert, who was the only SWAT member among the officers present. Upon arrival, Bergert realized the other non-SWAT officers

had created a "fatal funnel," meaning that they were taking cover behind the glass windows of the building, which provides a dangerously false sense of security. Bergert decided to take charge and had several officers line up with him to enter the bank. Notwithstanding that multiple bank employees had been presented with the valid check and matching proper license only moments earlier, Mercado and the other bank employees not only failed to take any action to intervene when the police stormed inside the bank, but Mercado even went a step further and pointed to Valladares, signaling him as the robber. Bergert instructed everyone to lie on the floor with their hands extended. Everyone in the bank, including Valladares, complied with the command.

Valladares testified that he immediately went to the floor as ordered and outstretched his hands, with his license and check still in hand. Then, a police officer placed his boot on the back of Valladares's head, handcuffed him, and screamed at him, "Where's the weapon?". Valladares further testified that the police officer kicked him in the head while he was already handcuffed:

> [The police officer] started kicking me handcuffed on the floor . . . .
> He kicked me on the side of the head. You know, they were lifting
> me up by my hands . . . and sticking their hands all through my shirt
> and everything, asking me, Why are you doing this? Why are you
> doing this? Where is the weapon? And I'm like, I'm not doing
> anything. I'm not doing anything.

The officer with an AR-15 rifle admitted that he kicked Valladares in the head. Valladares recalled, "I was in pain. I was terrified . . . I was afraid for my life. I didn't know what they were going to do with me."

There is some limited surveillance video from the day of the incident, however there happen to be suspicious, convenient breaks in the footage. The video provided by the bank contains footage of Valladares as he lay on the floor without handcuffs, and Valladares after he was already on the floor and handcuffed, but the segment of the video showing Valladares being kicked is conveniently missing. Bank of America denies that this footage was erased, and asserts that the surveillance program is written to purposely create gaps in footage to create an easily downloadable file.

The opinion below, in rendering a decision as a matter of law, incorrectly relied exclusively on the police officer's version of the facts. Valladares, 141 So. 3d at 715. However, we view the facts in a light most favorable to the nonmoving party—in this case, Valladares. See Friedrich v. Fetterman & Assocs., P.A., 137 So. 3d 362, 365 (Fla. 2013). Furthermore, the evidence provided in the video does not support the version of the facts that a kick occurred before Valladares was handcuffed. The video revealed no kicks to the head before Valladares was fully secured in handcuffs on the floor.

The record does not clearly establish the exact moment that the officers realized that Valladares was not a robber, but it does indicate that at some point the police realized that after Valladares had been seriously injured, it was a totally false alarm, and officers asked to speak with Garcia. Valladares testified that the police verified his license and the check while he was still handcuffed.

An officer observed redness and bruising on the side of Valladares's head and called the paramedics. The paramedics advised Valladares to go to the hospital. Alor, the assistant bank manager trainee who had spoken with corporate security, approached Valladares while he was with the paramedics and asked if he was okay. Valladares stated that Alor also admitted to him that they realized that they had the wrong person and were terribly wrong.

During trial, Garcia admitted and confirmed that she was wrong in failing to properly and fully inform Alor and Mercado that Valladares was a customer, and that she was wrong in failing to say something to the police officers when they rushed in and attacked Valladares.

**Damages**

Following the kicks to the head, Valladares experienced headaches that were unlike any he had ever experienced, and was placed on pain medication. Valladares sought attention at a local hospital for his head pain that became

- 9 -

unbearable. However, after waiting about twenty hours in the emergency room, the hospital refused to treat him because he lacked health insurance.

He next sought treatment with a neurologist, a neuro-ophthalmologist, and a psychologist. The examinations by the neurologist revealed that Valladares suffers from muscle contractions that cause persistent headaches on a daily basis. Valladares suffers from sudden blurry vision, and as a result he can no longer work. His neuro-ophthalmologist diagnosed Valladares as having traumatic optic neuropathy, which could not be cured or corrected with corrective lenses.

Valladares's older sister established that her brother, once a happy person who hosted social gatherings at his apartment, became a social recluse after the incident. Valladares was forced to return to live with his parents because he spent the majority of his days bedridden and could no longer pay his rent. He has become a hoarder and is embarrassed to allow others into his bedroom. Valladares has installed a camera at his home because he fears he is being watched, and also has installed two locks on his bedroom door. Valladares avoids the area where the bank is located, no longer has any friends, and is unable to maintain a romantic relationship as a result of sexual dysfunction. Based on these various medically related problems, his psychologist diagnosed him as having post-traumatic stress disorder (PTSD) with anxiety and depression. The psychologist is of the opinion

that Valladares is "[a]t the severe end of the [PTSD] spectrum" and opines that the condition will only worsen.

## Legal Proceedings

Following the incident at the bank, Valladares filed an action against Bank of America for negligence, battery, and false imprisonment.[1]  In an apparent attempt to comply with the legislatively established permissive scope of punitive damages pursuant to Florida Statutes, section 768.72 (1999), Valladares did not include an allegation for punitive damages in his initial complaint.  Instead, he sought punitive damages for the counts of battery and false imprisonment in his Second Amended Complaint.  However, as evidence developed, it became clear that Valladares sought relief for punitive conduct, and the bank was aware of the allegations.  Further, Valladares consistently asserted acts beyond negligent reporting.  Specifically, the negligence count in Valladares's original complaint provided in part:

> 10.  The Defendant, BANK OF AMERICA, breached its duty of reasonable care in one or more of the following ways:
>
> (a)  Negligently and carelessly activating and failing to cancel the silent robbery alarm, <u>and failing to cancel said alarm when it knew or in the exercise of reasonable care should have known that the Plaintiff was not attempting to rob the bank</u>;

 (Emphasis added).

---

1.  Because Valladares was neither arrested nor prosecuted, he had no action for malicious prosecution.

Following a lengthy trial, the jury was instructed on claims of negligence, comparative negligence, false imprisonment, battery, and punitive damages. With respect to vicarious liability, the jurors were instructed, "Bank of America is responsible for any negligence of its employees in failing to supervise other employees." Furthermore, the punitive damages instruction provided:

> Valladares claims that punitive damages should be awarded against Bank of America for its employees' conduct in in [sic] the battery and false imprisonment of Valladares. Punitive damages are warranted if you find by clear and convincing evidence that Bank of America's employees were personally guilty of intentional misconduct, which was a substantial cause of injury to Valladares.

The verdict form itself did not specify that the punitive damages should be awarded only if the jury found that Bank of America committed one of the intentional torts.

The jury found that Bank of America was negligent, and that there was no negligence attributed to Valladares. However, the jury found in favor of the defendant bank on the claims for battery and false imprisonment. The instructions stated that punitive damages should be awarded in conjunction with findings against the bank if the bank employees were personally guilty of intentional misconduct. Notwithstanding the battery and false imprisonment findings, the jury found that the bank employees engaged in punitive conduct and the bank was liable for punitive damages. The jury awarded $3,000 in past medical expenses;

- 12 -

$100,000 in future medical expenses; $1.5 million for past pain and suffering; and $1 million for future pain and suffering for a total of $2,603,000 in compensatory damages. The jury additionally awarded $700,000 in punitive damages.

At the close of trial, the jury verdict appeared to be inconsistent in that the jury found in favor of the bank on the battery and false imprisonment claims, but the jury found in favor of Valladares that bank employees were personally guilty of punitive misconduct on punitive damages. Valladares's counsel brought this verdict inconsistency to the attention of the trial judge and the bank. Valladares requested that the matter be resubmitted to the jury. The bank objected to having the jury consider the inconsistency, disagreed, and waived any objection to the verdict. The bank later moved to set aside the judgment, for judgment notwithstanding the verdict, for new trial, and for remittitur. Each was denied and judgment was entered in favor of Valladares.

### District Court Proceedings

The Third District reversed and remanded for entry of judgment for the bank. After offering only one paragraph summarizing the incident in a light most favorable to the bank contrary to well established appellate principles, the Third District concluded that a person who contacts law enforcement to report criminal activity cannot be liable under a theory of simple negligence. Valladares, 141 So. 3d at 715.

- 13 -

Primarily relying on Pokorny, the Valladares court determined that those who report crimes are protected by a qualified privilege, and thus cannot be held liable for making a good faith report to the police, absent a showing of malice. Id. at 717. The court analogized the malice requirement to cases that concern malicious prosecution, arrest, defamation, or slander. Id. at 718. Ultimately, the court determined that the same malice standard should be applied to physical injury caused by mistaken reports to law enforcement. Id. Based on this standard, the court reasoned that the plaintiff failed to prove the elements required to establish a cause of action because he failed to present a claim beyond simple negligence.

Further, the court acknowledged that Harris was a case that cut against applying a qualified privilege to reports of suspected criminal activity: "To the extent Harris holds that a person can be liable for a negligent, but good faith, mistake in summoning the police, it conflicts with the authority summarized above which governs analogous situations. We respectfully disagree with it." Id. at 718 (emphasis added). Valladares now seeks review by this Court.

## ANALYSIS

This question presents a pure question of law and is, therefore, subject to de novo review. See Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So. 3d 1076, 1084-85 (Fla. 2008).

- 14 -

A misunderstanding of Florida law in connection with reports of criminal conduct to law enforcement has generated the foundation for the conflict we must now resolve, which involves this case, Pokorny, and Harris. Contrary to the understanding of the district court and Bank of America, Pokorny did not fully resolve all issues of negligence in this false reporting context. Pokorny did outline some parameters within which the law should operate regarding reports made to law enforcement by discussing the importance of a judicially created qualified privilege for those who may incorrectly but innocently report criminal conduct. Harris, on the other hand, directly discussed negligence, recognizing that a cause of action for negligent reports to law enforcement exists when the conduct goes beyond an innocent misunderstanding. The decision below expressly states that it disagrees with Harris. In addition, the decision below is in conflict with Pokorny because it has improperly applied Pokorny to the facts in this case. It is critical that we recognize and maintain a real, meaningful distinction between intentional torts, malicious prosecution, false arrest, and negligent acts arising from conduct in this context.

Although Valladares did not assert a claim of malicious prosecution, slander, or defamation, the Third District nonetheless incorrectly looked only to these types of cases for guidance. The confusion is not uncommon because these are the causes of action that most commonly arise from incorrect reports to the police. See

Valladares, 141 So. 3d at 718. However, the facts in the instant case are different. Although similar to certain victims of malicious prosecution, slander, and defamation, Valladares was wrongfully accused of committing a crime and suffered damages as a result. This reliance upon Pokorny is misplaced because it is not a negligence case. Further, Valladares lacked a cause of action under a malicious prosecution theory because he was never arrested, nor was he prosecuted.

The Third District primarily relied on Pokorny, which also involved a falsely reported bank robbery. In Pokorny, the plaintiff alleged that the bank had engaged in negligent, reckless, or intentional misconduct that proximately caused the false imprisonment of the plaintiff. 382 So. 2d at 680. This Court considered two of the five questions submitted for review:

> 1. Did the actions of the employees of the defendant, First Federal Savings and Loan Association of Largo, Florida, constitute "direct procurement" of an arrest under the teachings of Johnson v. Weiner, 19 So. 2d 699 (Fla. 1944), and its progeny?

> 2. Do the rules governing arrest and imprisonment by private citizens apply in this case?

Id. at 680-81.[2]

---

2. Three other questions were certified to this Court but were not answered. Pokorny, 382 So. 2d at 681, 683.

- 16 -

The jury was instructed that the bank could not be held liable if it found that the teller who reported the robbery acted reasonably in believing that a robbery was occurring, and the jury returned a verdict in favor of the bank. Id. at 680. This Court concluded that the teller acted reasonably and in good faith, and ultimately held in the arrest context that:

> [U]nder Florida law a private citizen may not be held liable in tort where he neither actually detained another nor instigated the other's arrest by law enforcement officers. If the private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's arrest does not make him liable when he did not in fact request any detention.

Id. at 682.

Harris also involved a false report of criminal activity at a bank. 482 So. 2d 1378. Harris was a customer at Lewis State Bank who realized that a strange name, "John Lewis," had appeared on her account. Id. at 1381 n.8. After informing Lewis State Bank of the apparent mistake, the bank told Harris that she could continue to withdraw money from the account. Id. Harris returned to Lewis State Bank and provided it with her social security and voter registration cards. Id. The bank also taught her how to fill out a withdrawal slip and allowed her to complete another withdrawal. Id. Harris made four additional withdrawals without issue. Id. When John Lewis finally realized that $975 had been withdrawn from his account, the bank indicated that someone had fraudulently

withdrawn money from his account. Id. Over three months later, Harris returned to Lewis State Bank and was apprehended by bank employees, who then reported her to the sheriff's department and delivered her into custody. Id.

Harris's negligence claim was dismissed at the trial level based on the language regarding negligence in Pokorny. Id. at 1383. Lewis State Bank argued the negligence count should fail because the only cause of action available was malicious prosecution.[3] See id. The court in Harris found that this was a misreading of Pokorny, reasoning:

> It is at least arguable that in the case sub judice, the misinformation allegedly reported to the police was not the result of an honest, good faith mistake on the part of the bank. The allegations upon which all the counts of appellant's complaint are based include acts beyond the innocent misunderstanding portrayed in Pokorny.

Id. at 1384 (emphasis added). Ultimately, the Harris court held that a negligence action was proper once the conduct of the bank passed a certain threshold:

> Because appellant's complaint sufficiently alleged a relationship voluntarily entered into by the bank which created a duty on the part of the bank to protect appellant from false accusations of forgery and theft, and because the allegations of the complaint, if taken as true, indicate that the bank had knowledge, or by the exercise of reasonable diligence would have had knowledge, that its acts and omissions were likely to result in injury to appellant, the trial court improperly dismissed the count for negligence.

Id. at 1385 (emphasis added).

---

3. Lewis State Bank additionally claimed that false imprisonment and fraud were not legitimate claims.

Rather than relying on the direct holding of Pokorny, the district court in this case focused on dicta—the discussion suggesting that malice is required to state a cause of action for mistakenly reporting a crime in the arrest context—in concluding that Valladares failed to allege a proper cause of action.  However, Pokorny did not address a cause of action for negligent reporting.  Indeed, the holding in Pokorny defined "direct procurement" under an arrest and false imprisonment cause of action.  The only statements made by this Court in Pokorny regarding a cause of action for negligent reporting were made in dicta.  Furthermore, there is no statement in Pokorny that abolishes negligent reporting as a cause of action, nor did Pokorny point to any other cases that prohibit a cause of action for negligent reporting.  Therefore, the Third District erred in holding that this Court's decision in Pokorny precluded a cause of action for negligent reports to law enforcement.

Of course, this Court and others have long recognized that a judicially created qualified privilege exists in regard to injuries resulting from malicious prosecution, false imprisonment, defamation, and slander.  See Fridovich v. Fridovich, 598 So. 2d 65, 68-69 (Fla. 1992) (holding that a qualified privilege exists for defamatory statements made to police when such statements are not made maliciously); Burns v. GCC Beverages, Inc., 502 So. 2d 1217, 1220 (Fla. 1986) (holding that a company was not liable for malicious prosecution when an

- 19 -

employee, in good faith and without specifically requesting arrest, reported suspected criminal activity to law enforcement); <u>Myers v. Jim Russo Prison Ministries, Inc.</u>, 3 So. 3d 411, 412 (Fla. 2d DCA 2009) (applying the qualified privilege to slander arising from false reports made to police); <u>Harris v. Kearney</u>, 786 So. 2d 1222, 1225 (Fla. 4th DCA 2001) (reasoning under <u>Pokorny</u> that there was no false imprisonment claim against Department of Children and Family agents who filed a complaint that resulted in the arrest of the appellant because the complaint was made in good faith); <u>Manis v. Miller</u>, 327 So. 2d 117, 118 (Fla. 2d DCA 1976) (holding that there is no liability "for false imprisonment upon a witness making an honest, good faith mistake in identifying a criminal suspect where the identification contributes to arrest and prosecution of the suspect").

This qualified privilege for mistaken, but good faith reports of suspected criminal activity is rooted in a public policy concern. In <u>Pokorny</u>, this Court recognized the dangers of a standard that would deter citizens from reporting crimes for fear of liability:

> Prompt and effective law enforcement is directly dependent upon the willingness and cooperation of private persons to assist law enforcement officers in bringing those who violate our criminal laws to justice. Unfortunately, too often in the past witnesses and victims of criminal offenses have failed to report crimes to the proper law enforcement agencies. Private citizens should be encouraged to become interested and involved in bringing the perpetrators of crime to justice and not discouraged under apprehension or fear of recrimination.

Pokorny, 382 So. 2d at 682 (quoting Manis, 327 So. 2d at 117). At the same time, this Court has considered the dangers of a standard that would provide absolute immunity or an absolute privilege for those who report crimes. In Fridovich, this Court considered whether false statements made to an officer are absolutely privileged from liability for defamation, even when made maliciously. This Court held that the privilege was not absolute because such a privilege would prevent the Court from providing a forum for redress of every wrong. Fridovich, 598 So. 2d at 69. The Court instead opted for a qualified privilege that precluded intentional or malicious reports from privilege. Id. at 69.

Therefore, the standard necessary is one that maintains a balance between protecting individuals from abusive accusations to the police, and encouraging citizens to report suspected criminal activity, as expressed in Burns:

> The tort of malicious prosecution is premised on the right of an individual to be protected from unjustifiable litigation or unwarranted criminal prosecution. Against this right, the need of society to bring criminals to justice by protecting those who, in good faith, report and legally prosecute persons apparently guilty of crime must be balanced. The latter need, in addition to the public policy in favor of the termination of litigation, dictates the plaintiff's heavy burden of proof.

Burns, 502 So. 2d at 1219.

Bank of America incorrectly interprets Pokorny to mean that the only cause of action available to Valladares was malicious prosecution. However, Valladares had no cause of action for malicious prosecution because he was never arrested or

prosecuted.  See id.  A standard that would preclude any cause of action for conduct beyond mere negligent reporting simply because the plaintiff was not arrested would not support a careful balance between protecting victims of falsely reported crimes and encouraging good faith reports.  Indeed, the standard proposed by the bank would prejudice victims such as Valladares.  Further, such a standard would shield negligent defendants from incurring liability for their tortious conduct simply because law enforcement chooses not to prosecute an individual.  Thus—regardless of whether a wrongful reporting resulted in an arrest—public policy supports the conclusion that those who are injured as a result of incorrect reports to the police should have access to redress for injuries.  Moreover, this Court is obliged by the Florida Constitution to provide access to courts for every wrong.  See art. I, § 21, Fla. Const.  We cannot turn a blind eye to those who cannot allege malicious prosecution, but nonetheless sustain injuries due to incorrect reports to police.  At the same time, we recognize the importance of encouraging citizens to report suspected crimes.  Therefore, we hold that a cause of action for negligent reporting arises when there is incorrect reporting plus conduct on the part of the reporting party that rises to the level of punitive conduct.

The conduct required to allege punitive conduct reaches beyond simple negligence.  U.S. Concrete Pipe Co. v. Bould, 437 So. 2d 1061, 1064 (Fla. 1983) ("Punitive damages cannot be assessed for mere negligent conduct, but must be

based on behavior which indicates a wanton disregard for the rights of others."

(citing Winn & Lovett Grocery Co. v. Archer, 171 So. 214 (1936))).  This Court

has defined the level of negligent conduct necessary to warrant punitive damages

as follows:

> The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."

Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483, 486 (Fla. 1999)

(quoting White Const. Co. v. Dupont, 455 So. 2d 1026, 1029 (Fla. 1984), receded

from on other grounds by Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010 (Fla.

2000)); Am. Cyanamid Co. v. Roy, 498 So. 2d 859, 861-62 (Fla. 1986) (also

quoting White Const. Co., 455 So. 2d at 1029); Chrysler Corp. v. Wolmer, 499 So.

2d 823, 824 (Fla. 1986) (citing Carraway v. Revell, 116 So. 2d 16, 19-20 (Fla.

1959)); see also W.R. Grace & Co.—Conn. v. Waters, 638 So. 2d 502, 503 (Fla.

1994) ("Punitive damages are appropriate when a defendant engages in conduct

which is fraudulent, malicious, deliberately violent or oppressive, or committed

with such gross negligence as to indicate a wanton disregard for the rights of

others.").  In this context, Florida Standard Jury Instruction (Civil) 503.1(b)(2)

- 23 -

defines gross negligence as conduct that is "so reckless or wanting in care that it constitute[s] a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

Relatedly, this Court has recognized that the required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter. Como Oil Co., Inc. v. O'Loughlin, 466 So. 2d 1061, 1062 (Fla. 1985) (discussing the holding in White Const. Co., 455 So. 2d at 1029); see also Carraway, 116 So. 2d at 18-19 ("[T]he character of negligence necessary to sustain a conviction for manslaughter is the same as that required to sustain a recovery for punitive damages.").

By requiring something more than simple negligence, but less than intent or malice, a requirement that the conduct rise to the level of punitive conduct in cases of incorrect reports to law enforcement accomplishes the task of encouraging legitimate criminal reports while providing a safeguard against abuse. At one time reporting criminal activity to law enforcement was viewed as a circumstance that would not lead to unexpected problems. Unfortunately, with the amount of violence and force that law enforcement officers face and encounter daily when they respond to reports of suspected criminal activity, officers at times respond with what may appear to the layman as significant force. The necessity of this force is a harsh reality in a world that has become increasingly violent. However,

if a party has information that he or she has incorrectly reported a particular individual, or should have known it was incorrect, and the force was applied, such a report is above and beyond a simple, innocent report of conduct. Therefore, parties who engage in reckless, wanton, or culpable conduct in connection with reporting a suspected crime to law enforcement are not protected by the qualified privilege. Public policy supports a limited immunity for those who make innocent, simple mistakes, but that limited immunity cannot extend to conduct that recklessly disregards the rights of others. In the case of Valladares, the bank had ample information and ample time to know the true facts and to correct the false report, but failed to do so. Once there is information indicating that a crime is not being committed, this limited privilege should not extend to a person's failure to alert law enforcement that a reported crime is a mistake or simply wrong. This goes a step beyond negligence. A standard that demands more than simple negligence, but does not overburden the plaintiff with proving intent or malice, serves the interest of encouraging reports of criminal activity while protecting victims from punitive conduct. It also protects law enforcement from being incorrectly and unnecessarily involved in an event with force and violence that can be avoided.

The Third District improperly applied the limited qualified privilege discussed in <u>Pokorny</u> to the facts in the instant case. We hold that the privilege

does not apply to incorrect and wrongful reports made to law enforcement when the conduct rises to the level of punitive conduct. When the conduct in connection with reporting suspected criminal activity evinces a reckless disregard of the safety and rights of others—or as in this case—the parties involved either knew or should have known that their conduct was likely to cause harm, the qualified privilege cannot provide immunity to such behavior. Such an absolute immunity would frustrate the purpose of the qualified privilege, which is meant to encourage police reports by protecting only those who make <u>innocent</u> mistakes.

Additionally, we conclude that the case below is in conflict with <u>Harris</u>. The case below interpreted <u>Harris</u> to hold that there is a cause of action for simple negligence when a crime is misreported in good faith, and thus expressly disagreed with it. <u>Valladares</u>, 141 So. 3d at 718. This was a mischaracterization of <u>Harris</u>.

Because we have confirmed that <u>Pokorny</u> did not abolish negligence as a cause of action for incorrect reports to law enforcement, the holding in <u>Harris</u> is consistent with Florida law. The trial court in <u>Harris</u> erred when it dismissed a negligence claim because the acts of the defendant went "beyond the innocent misunderstanding" in <u>Pokorny</u>. This language demonstrates a cause of action for something <u>beyond</u> simple negligence, but not necessarily something at the level of malice or intent. There is no basis to support that the trial court in <u>Harris</u> was required to make a finding of actual knowledge or intent. Rather, the holding in

- 26 -

Harris is consistent with the public policy concern to encourage reports to law enforcement without condoning reckless, culpable conduct where the defendant knows or should know that the conduct would result in harm to others. Bank of America's behavior was analogous to the behavior of the bank in Harris in that it also committed acts that went beyond an innocent misunderstanding.

Valladares did not specifically allege punitive damages under the negligence count in his original complaint in an attempt to comply with section 768.72, Florida Statutes. Although this presents a problem with his award for punitive damages, it should be noted that this statute, precluding an allegation of punitive damages in the initial complaint, has no application to a cause of action for negligent reporting of criminal conduct. Section 768.72 pertains only to a demand for punitive damages. Thus, a plaintiff asserting a cause of action for conduct that rises to the level of punitive conduct in the context of criminal reporting must include that allegation in the initial complaint.

In this case, Valladares did plead beyond simple negligence in reporting in his Second Amended Complaint. Valladares's Second Amended Complaint provides, in relevant part, under the count for negligence:

9. The Defendant, BANK OF AMERICA, owed a duty to use reasonable care for the Plaintiff's safety.

10. The Defendant, BANK OF AMERICA, breached its duty of reasonable care in one or more of the following ways:

(a)  Negligently and carelessly activating and failing to cancel the silent robbery alarm, and failing to cancel said alarm when it knew or in the exercise of reasonable care should have known that the Plaintiff was not attempting to rob the bank;

(b)  Failing to properly train its employees, including but not limited to Defendants ALOR and GARCIA, concerning the identification of suspected bank robbers, and the handling of suspected robberies that turn out to be unfounded.

(Emphasis added).  Here, Valladares did not allege negligent reporting alone. Valladares alleged negligent reporting, and separately alleged the bank's failure to cancel the report after the bank had sufficient information to know that Valladares was not a bank robber.

Moreover, the bank cannot avoid responsibility by claiming that it does not owe a duty to its customers.  We have long recognized that businesses owe a duty of reasonable care to their invitees to maintain safe conditions on business premises.  Fetterman & Assocs., 137 So. 3d at 365.  Specifically, businesses owe their invitees a duty of care to (1) maintain their premises in a way that ensures reasonably safe conditions, and (2) advise the invitee of any reasonably unknown hidden dangers of which the owner either knew or should have known.  Id. at 365 (quoting Morales v. Weil, 44 So. 3d 173, 178 (Fla. 4th DCA 2010)).  This duty not only applies to dangerous conditions that arise and require correction, but also to taking action to mitigate or eliminate the possibility of a foreseeable risk of harm before it occurs.  See Markowitz v. Helen Homes of Kendall Corp., 826 So. 2d

- 28 -

256, 259-60 (Fla. 2002) (discussing the mode of operation theory). One may establish foreseeability by a showing that the business had actual or constructive knowledge that a dangerous condition that is likely to cause harm exists on the premises. Hall v. Billy Jack's, Inc., 458 So. 2d 760, 761 (Fla. 1984) (discussing foreseeability in the context of a tavern's knowledge of a person's inclination to be violent). If despite knowledge or actual knowledge of a risk of danger, management still fails to take steps to avoid that danger, the business may have breached its duty and thus be required to pay damages for resulting injuries to its invitee. See id. at 762.

In this case, the jury instructions provided that a finding of negligence against the bank was warranted if the jury found the bank to be vicariously liable for the negligent actions of its employees, and the jury did make such a finding. Additionally, our own review of the record reveals numerous wrongful actions from the time Valladares entered the bank until he was severely injured by a violent kick to the head.

However, because there was a failure to allege punitive conduct in the pleadings, improper instructions to the jury regarding punitive conduct and intentional conduct, an inconsistency in the verdict, and an inappropriate argument that an intentional act is required for a cause of action for negligent reporting, we

cannot simply reinstate the jury verdict.  This case must be remanded for a new trial.

**CONCLUSION**

For the foregoing reasons, we conclude that the decision below expressly and directly conflicts with the decisions in Pokorny and Harris.  We hold that negligence is a valid cause of action for injuries arising from mistaken reports to law enforcement when the conduct complained of demonstrates reckless, culpable conduct to the level of punitive damages.  We therefore quash the decision below, and remand this case for new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I conclude that the decision of the Third District in Bank of America Corp. v. Valladares, 141 So. 3d 714 (Fla. 3d DCA 2014), does not expressly and directly conflict with our decision in Pokorny v. First Federal Savings & Loan Ass'n of Largo, 382 So. 2d 678 (Fla. 1980), or the decision of the First District in Harris v. Lewis State Bank, 482 So. 2d 1378 (Fla.

- 30 -

1st DCA 1986), I would dismiss this case for lack of jurisdiction under article V, section 3(b)(3) of the Florida Constitution.

"This Court may only review a decision of a district court of appeal that expressly and directly conflicts with a decision of another district court of appeal or the Supreme Court on the same question of law." Jenkins v. State, 385 So. 2d 1356, 1359 (Fla. 1980). This Court's jurisdiction to review decisions of courts of appeal for express and direct conflict is invoked by "the application of a rule of law to produce a different result in a case which involves substantially the same [controlling] facts as a prior case" or "the announcement of a rule of law which conflicts with a rule previously announced by this court or another district[.]" Mancini v. State, 312 So. 2d 732, 733 (Fla. 1975); see Adams v. Seaboard Coast Line R.R. Co., 296 So. 2d 1, 3 (Fla. 1974).

Valladares does not expressly and directly conflict with Pokorny because the cases do not announce conflicting rules of law. In Valladares, the Third District addressed whether a person can be held liable for simple negligence for contacting the police to report suspected criminal activity and held that

> [a] person calling the police to report a possible crime is not liable for a good faith mistake even if the individual reported suffers personal injuries at the hands of the police. Calling the police to report a crime rises to the level of a tort only if the reporter acts maliciously, meaning the reporter either knows the report is false or recklessly disregards whether the report is false.

- 31 -

<u>Valladares</u>, 141 So. 3d at 715, 718.  In contrast, this Court in <u>Pokorny</u> addressed whether a person may be held liable for unlawful detention or false imprisonment based on contacting the police to report suspected criminal activity.  In <u>Pokorny</u> we held that

> under Florida law a private citizen may not be held liable in tort where he neither actually detained another nor instigated the other's arrest by law enforcement officers.  If the private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's arrest does not make him liable when he did not in fact request any detention.

<u>Pokorny</u>, 382 So. 2d at 682.  Although both <u>Valladares</u> and <u>Pokorny</u> involve fact patterns in which the defendant allegedly made an erroneous report to the police, they deal with different theories of liability.  <u>Valladares</u> addresses a claim of simple negligence and <u>Pokorny</u> addresses claims of unlawful detention and false imprisonment.  But the reasoning of the two cases is consistent: both recognize a rule of no liability for good faith mistakes associated with erroneous reports to the police.  And nothing in <u>Pokorny</u> suggests that the good faith rule it articulates should not be extended to a claim of simple negligence for making an erroneous report to the police.  <u>Pokorny</u> thus provides no basis for the Court to exercise conflict jurisdiction over <u>Valladares</u>.

Nor does <u>Valladares</u> expressly and directly conflict with <u>Harris</u>.  As explained previously, <u>Valladares</u> addressed whether an individual can be held liable for simple negligence for contacting the police to report suspected criminal

- 32 -

activity, and the Third District held that a person calling the police to report a possible crime is not liable for a good faith mistake even if the individual reported suffers personal injuries at the hands of the police. <u>Valladares</u>, 141 So. 3d at 715, 718. The First District in <u>Harris</u> addressed the sufficiency of a negligence cause of action to withstand a motion to dismiss, reasoned that "[i]t is at least arguable that in the case sub judice, the misinformation allegedly reported to the police was <u>not</u> <u>the result of an honest, good faith mistake</u> on the part of the bank[,]" and held that

> [b]ecause appellant's complaint sufficiently alleged a relationship voluntarily entered into by the bank which created a duty on the part of the bank to protect appellant from false accusations of forgery and theft, and because the allegations of the complaint, if taken as true, indicate that the bank had knowledge, or by the exercise of reasonable diligence would have had knowledge, that its acts and omissions were likely to result in injury to appellant, the trial court improperly dismissed the count for negligence.

<u>Harris</u>, 482 So. 2d at 1384-85 (emphasis added). Specifically, the complaint in <u>Harris</u> alleged the bank had encouraged and facilitated withdrawals by the appellant from a third person's account; that "the bank did not reveal to [that person] what had transpired between bank employees and appellant, but instead led him to believe that someone with criminal intent had" made withdrawals based on a forged signature; and that the appellant was "seized by bank employees" and turned over to the custody of the police. <u>Id.</u> at 1381 n.8. These facts in <u>Harris</u> set the case apart from <u>Valladares</u>, where a bank teller simply "mistook Valladares for a bank robber" and made a report to the police. <u>Valladares</u>, 141 So. 3d at 715.

Nothing in <u>Harris</u> suggests that liability can be predicated on a good faith mistake in reporting a suspected crime to the police. There is no express and direct conflict with <u>Valladares</u>.

This Court lacks jurisdiction under the Florida Constitution to review <u>Valladares</u>. Accordingly, I dissent.

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal - Direct Conflict of Decisions

     Third District - Case No. 3D12-1338

     (Miami-Dade County)

Joel Stephen Perwin of Joel S. Perwin, P.A., Miami, Florida; and Mark Gabriel DiCowden of Mark G. DiCowden, P.A., Aventura, Florida,

     for Petitioner

Adam Matthew Topel, J. Randolph Liebler, and Tricia Julie Duthiers of Liebler, Gonzalez & Portuondo, Miami, Florida,

     for Respondent