IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

THE ESTATE OF NICHOLAS ADAM
BLAKELY, BY AND THROUGH
MICHELLE WILSON, AS PERSONAL
REPRESENTATIVE,

        Appellant,

 v.

                                      Case No.  5D21-2547
                                      LT Case No. 2018-12178-CIDL

STETSON UNIVERSITY, INC.,

        Appellee.

_____/

Opinion filed December 30, 2022

Appeal from the Circuit Court
for Volusia County,
Kathryn D. Weston, Judge.

A. Lance Reins, Rainey C. Booth, Jr.,
and Joanna Greber Dettloff, of
Mendes, Reins & Wilander, PLLC,
Tampa, and Christopher
Klemawesch, and Jason M. Melton,
of Whittel & Melton, LLC, Spring Hill,
and Romero Pearson, of Pearson
Law Group, LLC, Lawrenceville, GA,
for Appellant.

Michael R. D'Lugo, and Richard E. Ramsey, of Wicker Smith O'Hara McCoy & Ford, P.A., Orlando, for Appellee.

EVANDER, J.

In this wrongful death case, the Estate of Nicholas Adam Blakely, by and through Michelle Wilson, as personal representative ("Wilson"), timely appeals a final judgment entered after the trial court granted summary judgment for the defendant, Stetson University, Inc. ("Stetson"). The trial court found that two identical releases signed by Blakely in order to play football for Stetson were sufficiently clear to bar claims brought against Stetson arising from Blakely's cardiac death after participating in a football practice.

On appeal, Wilson raises two issues. First, she contends that the language in the releases was insufficient to be enforceable as a matter of law. Second, she argues that genuine issues of material fact exist concerning the scope of the release and whether Stetson's alleged tortious conduct fell within that scope. We find merit to Wilson's first argument and, accordingly, we reverse the final judgment entered in favor of Stetson. Because we find the releases were unenforceable, we find it unnecessary to address Wilson's second argument.

2

On cross-appeal, Stetson argues that if this Court reverses the final judgment, it should also reverse the trial court's order allowing Wilson to add a claim for punitive damages. We find merit to the cross-appeal, and accordingly, we reverse that order as well.

Nicholas Blakely was a student and scholarship football player at Stetson in 2016 and 2017, his freshman and sophomore years in college. He pulled himself out of an afternoon football practice on August 28, 2017, complaining to an assistant athletic trainer that he was feeling dizzy and that his chest felt tight. The assistant athletic trainer took Blakely to the sideline, took his pulse,[1] gave him water to cool down, removed his helmet, loosened his shoulder pads, and had him stand in the shade. Trainers continued to monitor Blakely's symptoms. However, after resting on the sideline for approximately forty to forty-five minutes, Blakely collapsed.

In addition to calling 911, Stetson employees attempted various emergency medical procedures in an unsuccessful effort to revive Blakely. Blakely was transported to the hospital, where he ultimately died.

There was record evidence that during an April 2017 practice, Blakely had complained to an assistant athletic director of chest pain. He also

---

[1] The record evidence reflects that when Blakely's pulse was first checked, it was between 160 and 170 beats per minute. Blakely's pulse rate started to decrease shortly thereafter.

advised the trainer that he had experienced one or two incidents of chest pain in high school, but both of those incidents had resolved quickly. The chest pain incident of April 2017 also resolved in just a few minutes. The assistant athletic trainer did not document the April incident or otherwise do anything with the information provided by Blakely. Furthermore, when Blakely returned to school after summer break, Stetson did not have him undergo a physical examination prior to him participating on the football team for the upcoming season.

There is also record evidence that on the morning of August 28, 2017, the day Blakely died, Blakely advised the head football athletic trainer that he was not feeling well, that he had a bad cough, chest congestion, and shallow breathing. The trainer took Blakely's temperature which was negative for fever. The trainer believed Blakely had a cold and did not refer him to the student health clinic. Blakely was permitted to continue participation in the planned activities for the day without restriction.

The operative amended complaint included counts for negligence and breach of fiduciary duty. In its answer, Stetson raised as an affirmative defense that Blakely had signed two identical releases prior to his participation on the football team in 2016 and 2017, which barred the claims brought against Stetson. The releases signed by Blakely read as follows:

4

## STETSON UNIVERSITY DEPARTMENT OF ATHLETICS
### Athletic Participation Release of Liability and Waiver of Liability

### Please Read Carefully

I am aware that playing or practicing to play/participate in any sport can be a dangerous activity involving many risks of injury. **I understand that the dangers and risks of playing or participating/practicing may include, but are not limited to: death,** serious neck injury, serious spinal cord injury, which may result in complete or partial paralysis, brain damage, serious injury to virtually all internal organs, serious injury to virtually all bones, joints, ligaments, muscles, tendons, and other aspects of the muscular-skeletal system, serious injury or eye impairment, and serious injury to other aspects of my body, general health and well-being. I understand that the dangers and risks of playing or participating/practicing in the Stetson University Athletic Department programs may result not only In serious injury, but in a serious impairment of my future abilities to earn a living, to engage in other business, social, and recreational activities, and generally to enjoy life.

**Because of the dangers and risks involved in participating in intercollegiate athletics, I recognize the importance of following the Coaches and Sports Medicine staff instructions regarding playing techniques, conditioning, rehabilitation/ treatment recommendations and team rules, etc., and agree to obey such instructions.**

In consideration of Stetson University permitting me to play/participate for Stetson University intercollegiate athletics in all activities related to the team, including, but not limited to: trying out, practicing, playing/participating or team travel in that sport, **I hereby assume all risks associated with participation and agree to hold Stetson University**, it's [sic] trustees, administration, coaches, athletic trainers and athletic training interns **from any and all liability**, actions, causes of actions, debts, claims or demands **of any kind or nature which may**

5

**arise by or in connection with my participation in any activities related to the Stetson University athletic program. The terms hereof shall serve as a release and assumption of risk for myself, my heirs, estate, executor, administrator, assignees and for all members of my family.**

**The terms hereof shall serve as a complete release and waiver of liability for myself, my heirs, estate, executor, administrator assignees, and for all members of my family.**

(emphasis added).

In its motion for summary judgment, Stetson argued that the releases clearly and unambiguously released Stetson from any and all liability arising from Blakely's participation in Stetson football activities. In response, Wilson argued, inter alia, that the releases did not mention negligence and contained contradictory and ambiguous provisions rendering the releases unenforceable. In granting Stetson's motion, the trial court found that the releases were "clear and understandable so that an ordinary and knowledgeable person would know what is being contracted away" and "would be clear to even someone who is not an adult that executing them would release all claims."

We review orders granting summary judgment de novo. *Volusia Cnty. v. Aberdeen at Ormond Beach, L.P.*, 60 So. 2d 126, 130 (Fla. 2000). Here, we are called upon to determine the enforceability of the exculpatory

6

provisions set forth in Stetson's Athletic Participation Release of Liability and Waiver of Liability.

"An exculpatory clause purports to deny an injured party the right to recover damages from a person negligently causing his injury. They are disfavored in the law because they relieve one party of the obligation to use due care and shift the risk of injury to the party who is probably least equipped to take the necessary precautions to avoid the injury and bear the risk of loss. Such clauses are strictly construed against the party seeking to be relieved of liability. Thus, exculpatory clauses are enforceable only where and to the extent that the intention to be relieved from liability is made clear and unequivocal. The wording must be so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away." *UCF Athletics Ass'n, v. Plancher*, 121 So. 3d 1097, 1101 (Fla. 5th DCA 2013) (internal citations and quotations omitted), *approved in part, quashed in part*, 175 So. 3d 724 (Fla. 2015).

In the present case, the exculpatory clause did not expressly inform Blakely that by executing the document at issue, he would be contracting away his right to sue Stetson for Stetson's own negligence. Although this omission does not, standing alone, render the exculpatory clause unenforceable, *see Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256 (Fla.

7

2015), it is a factor for a court to consider in determining whether the exculpatory clause is clear and unambiguous. *Plancher*, 121 So. 2d at 1101, 1102; *see also Sanislo*, 157 So. 3d at 271 ("Despite our conclusion [that an exculpatory clause can be effective to bar a negligence action despite the absence of expressed language referring to the release of the defendant for its own negligence], we stress that our holding is not intended to render general language in a release of liability *per se* effective to bar negligence actions.").[2]

---

[2] In its answer brief, Stetson argues that the Florida Supreme Court's decision in *Sanislo* renders "meaningless" the absence of the words "negligent" or "negligent acts." We reject this argument. *Sanislo* was a 4–3 decision, in which two of the justices in the majority concurred in result only. The other two justices in the majority joined in an opinion that concluded that the ultimate question in this case was whether the exculpatory clause, when considered in its entirety, "clearly conveys that Give Kids the World, Inc. would be released from any liability, including negligence, for damages, losses, and injuries due to transportation, food, lodging, entertainment, and photographs." The supreme court's decision in *Sanislo affirmed* this court's position that the failure of an exculpatory clause to express the informed designee would not, in and of itself, render the clause unenforceable. *Sanislo*, 157 So. 3d at 258.

Contrary to Stetson's suggestion, the *Sanislo* decision did not expressly or implicitly overrule this court's determination in *Plancher* that the failure to expressly reference that the defendant was being released for its own negligence could operate with other factors to invalidate an exculpatory clause. Furthermore, none of the seven justices suggested a belief that the absence of the words "negligent" or "negligent acts" was meaningless. To the contrary, the three dissenting justices concluded that the words were required, while the two justices in the majority who opined on the issue

8

In addition, there are at least two provisions which, combined with Stetson's failure to expressly inform Blakely that he was contracting away his right to sue Stetson for Stetson's negligence, render the exculpatory provision unclear and ambiguous. First, immediately preceding the exculpatory clause, Blakely was advised that it was important that he comply with Stetson's medical staff's instructions regarding, inter alia, conditioning and treatment and, indeed, was required to obey such instructions. As was stated in *Plancher*, this type of language, when coupled with a clause that does not expressly state that the athlete would be waiving a negligence action, could reasonably lead the athlete to believe that the university "would be supervising his training and instructing him properly (non-negligently), and that he was only being asked to sign the exculpatory clause to cover injuries inherent in the sport." *Plancher*, 121 So. 3d at 1102; *see also Murphy v. Young Men's Christian Ass'n of Lake Wales, Inc.*, 974 So. 2d 565, 568–69 (Fla. 2d DCA 2008) (holding where waiver expressly releasing YMCA from any claims based on YMCA's negligence also included provision suggesting that YMCA would take "every reasonable precaution" against accidents, waiver was unenforceable because a reasonable reader might be

---

agreed "that it may be better practice to expressly refer to 'negligent' or 'negligent acts' in an exculpatory clause." *Sanislo*, 157 So. 3d at 270.

9

led to believe that waiver of liability only extends to claims for injuries that were unavoidable "even when every reasonable precaution" had been taken by YMCA; "[C]onfusion results from the juxtaposition of the 'every reasonable precaution' provision with the provision for the release of 'any claims based on negligence.'").

Second, the final two sentences of the releases state that the releases serve as a release "*for* myself," not "*by*" myself. Specifically, these sentences read, in relevant part: "[T]he terms hereof shall serve as a release and assumption of risk *for* myself . . ." and "The terms hereof shall serve as a complete release and waiver of liability *for* myself, . . . ." (emphasis added). As Wilson observes, the word "for" is defined to mean "used to indicate the person or thing that something is sent or given to." In other words, the use of the word "for" can suggest that the terms of the release are for the benefit of Blakely, that is, if he follows the instructions of Stetson's athletic department personnel and causes injury to another while participating in the dangerous activity of playing football, he is released from liability.

As we have previously observed, exculpatory clauses are to be strictly construed against the party seeking to be relieved of liability. Here, Stetson's Athletic Participation Release of Liability and Waiver of Liability form: 1) failed to expressly inform Blakely that he was contracting away his right to sue

10

Stetson for Stetson's own negligence, 2) used language that could reasonably lead one to believe that the university would be supervising and training properly so that he was only being asked to sign the exculpatory clause to cover injuries inherent in a sport, and 3) used language suggesting that the terms of the release were for Blakely's benefit. The combination of these factors supports a determination that the exculpatory clause was not clear and unambiguous. As a result, we conclude that the exculpatory clause relied upon by Stetson is unenforceable and that the trial court erred in granting summary judgment in favor of Stetson.

Cross-Appeal

A trial court's order granting or denying a motion to amend complaint to add a claim for punitive damages is reviewed de novo. *Est. of Despain v. Avante Grp., Inc.*, 900 So. 2d 637, 644 (Fla. 5th DCA 2005). The appellate court views the record evidence and the proffered evidence in the light most favorable to the plaintiffs and accepts said evidence as true for the purpose of reviewing whether a reasonable basis exists for punitive damages. *Id.*

A defendant may be held liable for punitive damages only if the trier of fact finds that the defendant was guilty of intentional misconduct or gross negligence. *See* § 768.72(2), Fla. Stat. (2017). In the instant case, Wilson

did not allege that Stetson engaged in intentional misconduct but rather relied solely on allegations of gross negligence.

Section 768.72(2)(b) defines "gross negligence" as conduct "so reckless or wanting in care that it can constitute a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

Here, Wilson argues that punitive damages are justified because:

(1) [D]espite being directly put on notice of numerous agency guidelines and best practices to the contrary – Stetson, through its managing agents including its Director of Sports Medicine, failed to implement ECG screening of student-athletes based at least in part on the cost of implementing such screening, failed to implement any emergency action plan or policies and procedures regarding Sudden Cardiac Death, and failed to provide its athletic trainers and coaches with any specialized training dealing with Sudden Cardiac Death.

(a) . . . Stetson athletic trainers and coaches were made aware of [Blakely's] repeated complaints of chest pain, shortness of breath, congestion, dizziness, and an "alarming" elevated heart rate that, according to a Stetson Athletic Trainer, should have been a red flag when combined with his other symptoms. But, due to the lack of policies and procedures, training, and emergency action plans at Stetson, the athletic trainers and coaches did not treat these textbook signs of cardiac distress as a cardiac emergency as they should have, resulting in [Blakely's] death. . . . ;

(2) [Stetson] actively and knowingly participated in the company's practice of declining to implement use of ECG screening, specialized training, emergency action plans, and policies and procedures in accordance with numerous guidelines and best practices to protect student-athletes from the leading cause of unexpected deaths in NCAA Athletes and allowing its athletic trainers to train athletes in complete ignorance and

12

disregard of Sudden Cardiac Death while knowing that such a practice was grossly negligent; and

(3) . . . Stetson's officers, directors or managers – including its Director of Sports Medicine who was the ultimate decision-maker on all matters at issue in this case – knowingly condoned, ratified, or consented to the grossly negligent and recklessly indifferent conduct by failing to respond in any way to the threat of Sudden Cardiac Death despite being put on notice of the life threatening issue, the position of various agencies, and related best practices.

There is record evidence that supports some of those allegations. However, taking the record evidence and proffered evidence in the light most favorable to Wilson, we conclude that Wilson has not met the threshold necessary to state a claim for punitive damages. The Florida Supreme Court has stated that: "[t]he character of negligence necessary to sustain an award of punitive damages must be of a 'gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.'" *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016) (quoting *Owens-Corning Fiberglass Corp. v. Ballard*, 749 So. 2d 43, 46 (Fla. 1999)). Wilson's evidence

13

falls short of meeting that standard. Accordingly, we conclude that the trial court erred in granting Wilson's motion to amend complaint to add a claim for punitive damages.

REVERSED and REMANDED.

LAMBERT, C.J. and HARRIS, J., concur.