DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**WILLIAM HARDER,** individually and as a Detective with the **CITY OF FORT LAUDERDALE POLICE DEPARTMENT, THE TJX COMPANIES, INC.,** and **DEREK CARLSON,**
Appellants,

v.

**LATOYA EDWARDS,**
Appellee.

Nos. 4D14-1732
and 4D14-1928

[August 26, 2015]

Consolidated appeals from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Thomas M. Lynch, IV, Judge; L.T. Case No. 09-55260 (05).

Robert H. Schwartz of McIntosh Schwartz, P.L., Fort Lauderdale, for appellant William Harder.

Kara Berard Rockenbach and Kristi Bergemann Rothell of Methe & Rockenbach, P.A., West Palm Beach, and Kera E. Hagan of Anderson, Mayfield, Hagan & Thron, P.A., West Palm Beach, for appellants The TJX Companies, Inc., and Derek Carlson.

Rosemary Wilder of Marlow, Adler, Abrams, Newman & Lewis, Coral Gables, for appellee.

GROSS, J.

Does the plaintiff's chosen legal remedy—the tort of false imprisonment—provide her compensation for enduring a horrible experience? On October 2, 2008, Latoya Edwards's wallet was stolen. Early on a June morning in 2009, in front of her family, she was arrested and taken to jail on a warrant accusing her of passing a fraudulent $281 check at a T.J. Maxx retail store. Edwards was the innocent victim of identity fraud; the true wrongdoer had used her stolen driver's license to complete the check transaction. Edwards recovered damages on a false imprisonment claim against the store, its investigative employee, and the

police detective who orchestrated her arrest.

We reverse the judgment against the store and its employee because their cooperation with the detective's investigation amounted to neither actual detention nor active instigation of the arrest. We reverse the judgment against the detective, because, even after removing all false statements from his warrant affidavit, the arrest warrant nonetheless was supported by probable cause.

The three defendants challenge the propriety of the trial court's rulings on their motions for directed verdicts. For this reason, we state the facts in the light most favorable to Edwards, the nonmoving party. *See Philip Morris USA, Inc. v. Kayton,* 104 So. 3d 1145, 1149 (Fla. 4th DCA 2012) ("An appellate court reviewing a ruling on a motion for directed verdict must view the evidence and all inferences of fact in a light most favorable to the nonmoving party.") (citation omitted). In doing so, we determine the credibility issues in favor of Edwards.

### *The Investigation*

Months before Edwards's arrest, Detective William Harder began investigating a fraudulent check ring based on information from an informant. Detective Harder placed a wire on the informant and gathered incriminating information, including evidence that the suspect had been using a computer software program—typically reserved for small businesses—to produce counterfeit checks. Over time, Detective Harder identified other "ringleaders" in the fraudulent check creation process. However, before reeling in the big fish, he wanted first to round up the minor players—those who actually cashed the checks.

To further the investigation, Detective Harder provided the account and routing number combinations extracted from the suspect's computer to Certegy, a third-party check verification system used by many businesses, such as T.J. Maxx, to verify the validity of the account and routing number listed on a check. In requesting assistance, Detective Harder wanted Certegy to determine whether the account and routing numbers taken from the suspect's computer matched those used in stores. In due time, Certegy prepared a spreadsheet containing hundreds of potential counterfeit checks fitting this description, around forty of which were cashed at T.J. Maxx stores. None of the checks involved Edwards.

At Certegy's suggestion, in late May, 2009, Detective Harder spoke with Derek Carlson—an investigator for T.J. Maxx—and requested that Carlson pull copies of the suspected counterfeit checks used at T.J. Maxx stores, as listed on the Certegy spreadsheet, and recover any surveillance video of

the transactions if available. In the initial conversation, Detective Harder summarized his investigation for Carlson and said that it appeared many of the persons cashing the checks were "using [their] true identities." Detective Harder also insisted that time was of the essence, since he was planning a "warrant blitz" on June 10, wherein he would arrest each suspect involved in the check cashing scheme at the same time.

In the ensuing days, Carlson did as instructed and made copies of the suspected checks contained in the Certegy list. As encouraged by statute,[1] each scanned check had the customer's driver's license number handwritten on its face. While performing the task, Carlson noticed there were certain similarities among the checks—all were between $200 and $500 and had pictures of cartoon characters. On his own, Carlson searched T.J. Maxx's system for similar criteria and made copies of twenty to thirty additional checks meeting this rubric—one of which was cashed by someone using Edwards's identification. Because the check with Edwards's information had been cashed more than sixty days prior to Carlson's investigation, there was no video of the transaction—just the check itself.

On June 2, 2009, Detective Harder e-mailed Carlson a draft affidavit for Carlson to sign. The next day, Detective Harder described the time pressure he was under, stating he was "running like a chicken with [his] head cut off getting all of these arrest warrants ready for [the] big swoop." Shortly thereafter, Carlson submitted a binder containing the copies of checks he extracted from T.J. Maxx's records—including the additional checks beyond Detective Harder's initial request. Carlson then executed the affidavit, which stated as follows:

> Before me, the undersigned sworn law enforcement official, this date, Investigator Derek Carlson, of . . . Marmaxx, Inc., parent company of T.J. Maxx, Marshalls, and HomeGoods, who, being duly sworn according to law, deposes and states that he has examined the check numbers bearing the name of the listed . . . companies, the drawers thereof, which checks are dated as listed in the amounts listed, made payable to the companies listed, drawn on the listed banks, bearing the drawer's signature as shown, which are all forged or

---

[1]*See* § 832.07, Fla. Stat. (2009). Chapter 832, Florida Statutes covers "Violations Involving Checks and Drafts." Section 832.07(2)(a) creates a procedure that establishes "prima facie evidence of identity" "[i]n any prosecution or action under the provisions of this chapter," i.e. for Chapter 832 prosecutions. Edwards was arrested on a forgery charge under Chapter 831, Florida Statutes (2009), so the section 832.07(2)(a) presumption did not apply.

counterfeit checks. That the deponent will assist law enforcement in the full prosecution of this case.

The affidavit is made voluntarily for the purpose of prosecuting those responsible for this act and is to establish the facts listed in the accompanying spreadsheet. As a result, Marmaxx sustained a loss of $13,165.95.

At trial, Carlson testified he never told Detective Harder that Edwards herself submitted the check.[2]

Detective Harder applied for—and received—an arrest warrant from a circuit judge. However, his affidavit in support of the warrant contained many false facts: that "Latoya Edwards[] did . . . utter, pass, or tender as true a counterfeit note, bank bill, or check draft, made payable to the bearer, knowing the same to be false, altered, forged, or counterfeit;" that "Latoya Edwards, did take counterfeit check #3957, in the amount of $281.38, made payable to T.J. Maxx . . . and presented same for payment knowing it to be a counterfeit bank check;" that Edwards was "one of the co-defendants who was recruited" by an organized fraud ring "to cash the counterfeit checks produced illegally;" that Derek Carlson of T.J. Maxx "verified that this check was presented by [Edwards]" and that Edwards "used her Florida Driver's License, as identification in presenting the counterfeit check"; and that Edwards got "to keep a portion of the proceeds from the counterfeit checks she cashed."

### *The Stolen Wallet*

Edwards knew nothing of the gathering storm about to engulf her. On October 2, 2008, Edwards was working as a substitute teacher at Boyd Anderson High School when her wallet went missing after she placed it on a bench. Edwards reported the wallet as stolen to the school's office manager and immediately went to the Department of Motor Vehicles to get a replacement driver's license. Edwards told DMV workers her license had been stolen. However, this information did not make it to the DAVID[3] system.

Not long after the wallet's disappearance, Edwards began receiving letters from businesses—including Citibank, Publix, CVS, and Walmart—regarding the possibility that her identity was being used for fraudulent purposes. Edwards advised each business that she was the victim of identity fraud. As the letters kept coming, Edwards again conferred with the school's office manager, who directed her to make a police report with

[2]Detective Harder testified that Carlson never stated that the "human being of Latoya Edwards . . . actually went in and passed th[e] check."
[3]The state's Driver and Vehicle Information Database.

- 4 -

the school resource officer, Tim Doughty.  Edwards did as instructed and Doughty provided her with a card and a case number, though not the report itself.

### *The Arrest and Interrogation*

With arrest warrants procured, Detective Harder assembled officer teams to make coordinated arrests around the same time.  One of the first on the list was Edwards, who resided in an apartment with her mother, brother, and sister.  At around 6:00 a.m., officers arrested Edwards in her bedroom, and led her out of the apartment in handcuffs, in front of her family.

At the station house, Edwards was taken to an interrogation room where the officers took off her handcuffs and chained her leg to a table.  There, she met Detective Harder, who questioned her about her involvement in the fraudulent check ring.  Edwards told the detective her wallet had been stolen, that she had filled out a police report, that she did not cash the check, and that the phone number and signature on the check were not hers.

Detective Harder directed that Edwards be taken downstairs to be fingerprinted, booked, and placed in a holding cell.  Eventually, Edwards was removed from the holding cell and put in a van to be taken to the Broward County jail.  Prior to the transport, Edwards again had to complete the booking process.  The next morning, at around 3:00 a.m., Edwards's family posted bail and she was released.

Later the same day, Edwards and her family returned to the police station to present Detective Harder with letters from the various businesses and an affidavit statement from the school's office manager showing she had been the victim of identity fraud.  By that time, Detective Harder had obtained a copy of Doughty's report, which he gave to Edwards.  Further, Detective Harder told Edwards the investigation was over and no formal charges would be filed.  On cross-examination, the detective conceded that prior to her arrest, he had no fingerprint of Edwards, no video of her passing the check, and no witness who said she committed a crime.  Of the first 23 arrests made during the June 10, 2009 sweep, Edwards was one of four innocent victims of identity fraud who were wrongfully arrested.  Many of those arrested claimed they were the victims of identity fraud.

### *The store and its employee did not take an active role in instigating an arrest, so neither can be held liable for false imprisonment*

"False imprisonment is the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and deprivation of his liberty." *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944). The tort's purpose is to protect personal freedom of movement by curtailing "detention without color of legal authority," which "occurs when 'there is an improper restraint [that] is not the result of a judicial proceeding.'"[4] *Card v. Miami-Dade Cnty. Fla.*, 147 F. Supp. 2d 1334, 1347 (S.D. Fla. 2001) (quoting *Jackson v. Navarro*, 665 So. 2d 340, 341-42 (Fla. 4th DCA 1995)); Dan B. Dobbs, *The Law of Torts* § 36, at 67 (2000). The key aspects of false imprisonment are "'imprisonment contrary to [the plaintiff's] will and the unlawfulness of the detention.'" *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir. 2006) (quoting *Rivers v. Dillards Dep't Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. 1st DCA 1997)) (applying Florida law).

To state a cause of action for false imprisonment, the plaintiff must establish four elements: "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So. 2d 1266, 1268 (Fla. 4th DCA 2006); *Mathis v. Coats*, 24 So. 3d 1284, 1289-90 (Fla. 2d DCA 2010).

With regard to the type of conduct that will subject a defendant to liability for false imprisonment, in *Johnson v. Weiner,* the Supreme Court wrote that "[t]o be liable in an action for false imprisonment, one must have personally and actively participated therein, directly or by indirect procurement." 19 So. 2d at 701. The concept of "indirect procurement" is not precise and arguably could cover a large swath of citizen contact with the police. However, in *Pokorny v. First Federal Savings & Loan Ass'n of Largo*, 382 So. 2d 678 (Fla. 1980), the Florida Supreme Court narrowed the scope of the "indirect procurement" phrase in *Weiner* and held that where a citizen provides information to law enforcement, without more, such action does not constitute false imprisonment. *See also Harris v. Kearney,* 786 So. 2d 1222, 1225 (Fla. 4th DCA 2001) (stating that "[m]erely providing information to the authorities that a violation of law occurred is

---

[4]*Cf. Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975) ("The action for false imprisonment is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement."); *Moody v. McElroy*, 513 A.2d 5, 7 (R.I. 1986); *Greenawalt v. Indiana Dep't of Corr.*, 397 F.3d 587, 590 (7th Cir. 2005).

not sufficient to support an action for false arrest"). Even "[i]f the private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's arrest does not make him liable when he did not in fact request any detention." *Pokorny*, 382 So. 2d at 682; *see also Manis v. Miller*, 327 So. 2d 117, 118 (Fla. 2d DCA 1976).

*Pokorny* held that "a private citizen may not be held liable in tort where he neither actually detained another nor instigated the other's arrest by law enforcement officers." 382 So. 2d at 682. To so "instigate" an arrest, the defendant must have taken an active role in encouraging or procuring the wrongful arrest. Procurement, in this context, "is the equivalent in words or conduct to 'Officer, arrest that man'." *Smith v. Dist. of Columbia*, 399 A.2d 213, 218 (D.C. 1979) (quoting Restatement (Second) of Torts, § 45A, Comment c). In *Pokorny*, the Supreme Court cited the Restatement (Second) of Torts, section 45A, Comment c, with approval. 382 So. 2d at 682. Comment c describes the zealous type of conduct that amounts to "instigation" of an arrest:

> If the confinement is unprivileged, the one who instigates it is subject to liability to the person confined for the false imprisonment. Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of "Officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

The rationale underlying the holding in *Pokorny* is grounded in sound policy. Confronted with a suspected criminal episode, private citizens should not be forced to weigh the interests of justice against the potential of financial loss. As the Third District recently explained, "[t]wo legitimate and competing interests are at odds [in such circumstances]. On one hand, an individual should be protected from abusive accusations. On the other hand, people must feel free, and indeed must be encouraged, to contact the police to report suspected criminal activity." *Bank of Am. Corp. v. Valladares*, 141 So. 3d 714, 716 (Fla. 3d DCA 2014), *review granted*, No. SC14-1629, 2015 WL 428394 (Fla. Jan. 28, 2015). Where potential criminal activity is encountered, "the public policy of Florida is to give wide latitude to an individual reporting a suspected crime to ensure a free flow of information between the people and the police." *Id.* at 717. Indeed,

> [p]rompt and effective law enforcement is directly dependent upon the willingness and cooperation of private persons to assist law enforcement officers in bringing those who violate our criminal laws to justice. Unfortunately, too often in the past witnesses and victims of criminal offenses have failed to report crimes to the proper law enforcement agencies. Private citizens should be encouraged to become interested and involved in bringing the perpetrators of crime to justice and not discouraged under apprehension or fear of recrimination.

*Id.* (quoting *Pokorny*, 382 So. 2d at 682).

*Pokorny* presents a fact situation which illustrates the principle that merely providing information to law enforcement cannot give rise to liability for false imprisonment. *See also, e.g., Smith v. Patterson*, 58 So. 2d 64 (Miss. 1952). In that case, the plaintiff—a deaf mute visiting Florida—went to a bank to obtain a coin bag and handed the teller a note, stating: "Please give me zipper bag." *Pokorny*, 382 So. 2d at 680. The teller attempted to inform the plaintiff the bank had no zipper bags and that he could get some across the street, but the plaintiff continued aggressively pointing at the note and then eventually towards the cash drawer. *Id.* When the plaintiff again pointed at the cash drawer, the teller "knew" a robbery was unfolding and called the police to report an attempted bank robbery. *Id.* Shortly thereafter, the plaintiff and a companion were apprehended by F.B.I. agents, handcuffed, and transported to Tampa, where they were detained for an hour and released. *Id.* No formal charges were filed. *Id.*

The plaintiff and his companion sued the bank for false imprisonment, alleging the bank's employees' reporting of the suspected crime constituted "negligen[ce], reckless[ness] or intentional misconduct." *Id.* The Florida Supreme Court ultimately ruled for the bank, finding determinative that its employees neither detained the plaintiffs nor instigated their arrest but rather "report[ed] a possible attempted robbery and identified [the] plaintiffs as the suspects." *Id.* at 682. They did not detain either of the plaintiffs, nor did they request law enforcement to make an arrest. *Id.* "As long as the employees acted reasonably," the Court held, "their action did not constitute 'direct procurement of an arrest.'" *Id.*; *see also Harris*, 786 So. 2d at 1225-26; *Moore v. Dep't of Corr.*, 833 So. 2d 822, 824 (Fla. 4th DCA 2002).

In this case, Carlson acted reasonably in performing his investigation and merely provided Detective Harder with the binder of fraudulent checks. The inescapable truth—which no one disputes—is that a crime

*did* occur in this case, though Edwards was not the one who committed it. Through his investigation, Carlson determined that the check bearing Edwards's personal information and driver's license was fraudulent—he then provided such information to Detective Harder. He did not tell Detective Harder to arrest Edwards. He did not encourage Detective Harder to arrest Edwards. He did not provide false information to Detective Harder to bring about Edwards's arrest. He provided accurate information—that a fraudulent check bearing Edwards's name had been cashed at a T.J. Maxx store—and allowed Detective Harder to exercise his discretion in pursuing his investigation. To hold Carlson and the store liable under such circumstances would be to punish a private citizen for reporting a crime. Directed verdicts should have been granted in favor of Carlson and T.J. Maxx.

### Under a Franks v. Delaware *analysis, after false information is jettisoned from the warrant affidavit, the warrant in this case still was supported by probable cause, so the false imprisonment verdict against Detective Harder cannot stand*

The general rule is that arrest and imprisonment, if based upon a facially valid process, cannot be false. *See Jackson*, 665 So. 2d at 341; *Fisher v. Payne*, 113 So. 378, 380 (Fla. 1927) ("Arrest under a warrant, valid in form, issued by competent authority on a sufficient complaint, is not false imprisonment, though the indictment under which the warrant was issued was procured maliciously . . . . "). This is so because any arrest based on a facially valid warrant is "under legal authority," so the resulting imprisonment cannot be false. *See, e.g.*, *Dodson v. Solomon*, 183 So. 825, 826 (Fla. 1938). It is an arrest based on a void warrant that falls outside of the general rule because a void warrant does not constitute "legal authority" for an arrest and detention. *Johnson*, 19 So. 2d at 700 (stating that "[v]oid process will not constitute legal authority within" the rule that imprisonment under legal authority cannot be false).

Edwards attacks Harder's misrepresentations in his affidavit in support of the warrant. We do not condone the detective's misrepresentations in securing the warrant. However, after removing the falsehoods from Harder's affidavit and analyzing what remains under the Fourth Amendment, we hold that there was probable cause to support Edwards's arrest. Therefore, even though Harder knowingly provided some false information, he nonetheless can rely upon the warrant to avoid liability for false imprisonment.

Under the constitutional framework of *Franks v. Delaware*, 438 U.S. 154 (1978), if a criminal defendant establishes by a preponderance of the

evidence that the affiant seeking a search warrant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit, then the reviewing court

> must excise the erroneous material and determine whether the remaining allegations in the affidavit support probable cause. If the remaining statements are sufficient to establish probable cause, the false statement will not invalidate the resulting search warrant. *See Terry v. State*, 668 So. 2d 954 (Fla. 1996). If, however, the false statement is necessary to establish probable cause, the search warrant must be voided, and the evidence seized as a result of the search must be excluded. *See id.* (citing *Franks*, 438 U.S. at 156); *see also Thorp v. State*, 777 So. 2d 385 (Fla. 2000).

*Murray v. State*, 155 So. 3d 1210, 1217 (Fla. 4th DCA 2015) (quoting *Garcia v. State*, 872 So. 2d 326, 330 (Fla. 2d DCA 2004)).

"As a general rule, where facts constituting probable cause are in dispute, the question is one for the jury, but if there is no dispute as to such facts, the question is for the court." *Rothstein v. Jackson's of Coral Gables, Inc.,* 133 So. 2d 331, 332 (Fla. 3d DCA 1961). "The question of whether probable cause exists is thus a jury issue only when material facts are in controversy." *LeGrand v. Dean,* 564 So. 2d 510, 512 (Fla. 5th DCA 1990) (citing *Glass v. Parrish,* 51 So. 2d 717 (Fla. 1951)). Here, the pertinent facts concerning the use of Edwards's license information are not in dispute.

"Probable cause to arrest . . . exists when the totality of the facts and circumstances within an officer's knowledge sufficiently warrant a reasonable person to believe that, more likely than not, a crime has been committed.'" *Santiago v. State,* 84 So. 3d 455, 459 (Fla. 4th DCA 2012) (quoting *League v. State,* 778 So. 2d 1086, 1087 (Fla. 4th DCA 2001)). "'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *State v. Russell,* 659 So. 2d 465, 468 (Fla. 3d DCA 1995) (quoting *Illinois v. Gates,* 462 U.S. 213, 231 (1983)) (internal quotations omitted).

Under a *Franks v. Delaware* analysis, with all of Detective Harder's falsehoods eliminated, a redacted affidavit still would have alleged that (a) the check cashed at the T.J. Maxx store was counterfeit and (b) Edwards's driver's license was used as identification in presenting the counterfeit

check. Such evidence is sufficient to establish probable cause that a crime was committed and that Edwards was the perpetrator. *See Abernathy v. Dover*, 228 S.E.2d 359 (Ga. Ct. App. 1976); *Corbett v. Walgreen Co.*, No. 7:14-CV-17(MTT), 2015 WL 1412746, at *4 (M.D. Ga. Mar. 27, 2015); *Bundy v. Best Prods. Co.*, 843 F.2d 1386 (table), 1988 WL 30672, at *1-*2 (4th Cir. 1988). Under Section 832.07, Florida Statutes (2009), which applies only to Chapter 832 offenses, similar evidence is sufficient to establish prima facie evidence of intent and identity in worthless check cases. Probable cause is a lesser standard than a prima facie showing. *See Doorbal v. State*, 837 So. 2d 940, 952-53 (Fla. 2003) ("[I]t is the 'probability, and not a prima facie showing, of criminal activity [that] is the standard of probable cause.'") (quoting *Gates*, 462 U.S. at 235); *State v. Rolle*, 560 So. 2d 1154, 1157 (Fla. 1990) (construing statutorily conferred "prima facie evidence" to be a "permissive inference," the basic fact of which could be sufficient evidence of the elemental fact). At the location where a check is presented to a merchant, the taking of driver's license information serves a similar function in a Chapter 831 prosecution as it does in a case brought under Chapter 832—it provides some evidence of the perpetrator's identity where it is unlikely a cashier would remember a specific transaction months later. If such information constitutes prima facie evidence of identity under Chapter 832, it is consistent to hold that the same information establishes probable cause of identity in a Chapter 831 prosecution.

To combat this conclusion, Edwards argues Detective Harder's investigation was too unreasonable to support probable cause, in that he conducted an inadequate investigation. Florida law requires an arresting officer to conduct a reasonable investigation in order to determine if probable cause exists to arrest a person, "but the officer does not have to take every conceivable step to eliminate the possibility of convicting an innocent person." *City of Clearwater v. Williamson*, 938 So. 2d 985, 990 (Fla. 2d DCA 2006) (citing *Rankin v. Evans*, 133 F.3d 1425 (11th Cir. 1998)). The "failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause." *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000). In any event, the available information at the relevant time on the DAVID system did not indicate that Edwards had reported her license as stolen.

Given the jury's resolution of this case, allowing Detective Harder to avoid liability for false imprisonment might seem unfair. His investigative approach did little to protect the rights of innocent victims of identity theft. In the future, the legislature may well take up the issue of what steps law enforcement must follow to avoid casting too wide a net in cases where identity theft is a realistic possibility. This case illustrates the limitations

of the false imprisonment remedy, which has led one commentator to observe that "the action for false imprisonment has remained relatively ineffective as a remedy, particularly for the violation of individual rights by the police." W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 11, at 50 (5th ed. 1984). Because other potential causes of action were not raised below, we do not consider them under the facts of this case.

We reverse the final judgments and remand to the circuit court for the entry of final judgments in favor of the defendants below.

DAMOORGIAN, J., and HERSCH, RICHARD L., Associate Judge, concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***