[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15959
Non-Argument Calendar
_____

D.C. Docket No. 6:15-cv-00711-CEM-TBS

ISMAEL LOZADA,

                                        Plaintiff - Appellant,

versus

HOBBY LOBBY STORES, INC.,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 31, 2017)

Before HULL, WILSON and JILL PRYOR, Circuit Judges.

PER CURIAM:

Michael Licari, manager of the Kissimmee, Florida Hobby Lobby store, called law enforcement to report that one of his employees, Ismael Lozada, was planning a mass shooting. Sheriff's deputies, including Tate Wilson, responded to the store and interviewed Licari, who related a series of troubling conversations among the store's employees about Lozada. After that interview, Wilson located Lozada and civilly committed him pursuant to Florida's Baker Act. Fla. Stat. § 394.451 *et seq.* Lozada was detained for approximately 36 hours. He was released, and no further action was taken against him.

Lozada filed this case alleging Florida state law claims of defamation and false arrest against Hobby Lobby Stores, Inc.[1] After discovery, the district court entered summary judgment for Hobby Lobby on both claims. The court granted summary judgment on Lozada's defamation claim because the allegedly defamatory statements on which it was based either were protected by qualified privilege or not attributable to Hobby Lobby under Florida law. The court granted summary judgment on Lozada's false arrest claim because Hobby Lobby did not instigate Lozada's arrest by law enforcement. Lozada challenges each of these rulings, but we agree with the district court that the undisputed evidence supported summary judgment. We therefore affirm.

---

[1] Lozada also alleged malicious prosecution, but he voluntarily dismissed that claim.

2

## I.  BACKGROUND

### A.    Hobby Lobby Employee Conversations

After they left the store on the evening of Tuesday, February 24th, 2015, Hobby Lobby employees Ray Dendariarina, Corey Cozzens, and Destinie Crupi had a conversation in the store's parking lot.  Cozzens mentioned "how negative" their fellow employee, Lozada, "was being."  Cozzens Statement, Doc. 33-17 at 8.[2] Dendariarina responded that Lozada was angry and had told Dendariarina that Lozada would shoot up[3] the store on the coming Saturday if he was not promoted from part-time to full-time status.

The next day, Wednesday, February 25th, Cozzens approached Mary Dellofano, the store's assistant manager, and reported what Cozzens had heard from Dendariarina.  Dellofano in turn reported the conversation to Licari, who took charge of the store's investigation.

### B.    Hobby Lobby's Investigation

Cozzens told Licari what she had heard.  Licari contacted his district manager, who told Licari to have Cozzens write out a statement.  Cozzens wrote out a statement explaining that Dendariarina had told her that Lozada was angry at being asked to clock out early that day and that Lozada had said he would shoot up

---

[2] Citations to "Doc." refer to the numbered entries in the district court record of the case.

[3] Cozzens reported hearing Dendariarina say that Lozada threatened to blow up the store. Throughout this opinion, we refer to a threatened mass shooting, but a threatened bombing would not alter our conclusions.

3

the store if not promoted to full-time status by Saturday. She also reported that Lozada legally carried firearms in his vehicle.

At the request of a human resources employee, Licari also spoke with Crupi and had her write out a statement. Crupi repeated Dendariarina's statement that Lozada threatened the store if he did not get what he wanted by Saturday. In her written statement, Crupi said that Lozada had told her several times that he was "tired of waiting for what was promised to him." Crupi Statement, Doc. 33-17 at 7. Crupi also related that she had heard Lozada complaining to other employees about the "full/part time" situation. *Id.* Crupi wrote that on Monday, Lozada had "that he was very mad about leaving early on a day he was not scheduled to leave until closing." *Id.* (internal quotation marks omitted). From previous conversations, Crupi knew that Lozada had firearms and kept one in his vehicle. She concluded her statement by warning that she did not know Lozada well enough to say that he was making hollow threats, "but with his temper lately and conversations, [she] g[o]t the feeling his threats [we]re everything but hollow." *Id.*

When Dendariarina arrived at work the next day, Thursday, February 26th, Licari and Dellofano called him into the office. Dendariarina told them that for a month Lozada had been speaking about coming to the store, shooting it up, and then killing himself. Dendariarina also related that Lozada had said he would commit a violent act on the coming Saturday if he was not promoted. At Licari's

request, Dendariarina wrote out a statement explaining what he had heard from Lozada over the past month.  He wrote that Lozada told him Licari had lied to another manager, and as a result Lozada would not be getting full-time status. Dendariarina cautioned that Lozada may have been speaking out of anger, and Dendariarina did not think Lozada would do what he was threatening.  "[B]ut," he concluded, "you never [k]no[w] people's anger" when "they think they [are] going to get something right away and they don[']t."  Dendariarina Statement, Doc. 33-17:11.

Licari forwarded the written statements to Hobby Lobby's corporate office. He then received a call from David Williams, who worked in Hobby Lobby's loss prevention department.  Williams advised Licari that Williams did not want Lozada in the store anymore, that Lozada no longer worked for Hobby Lobby, and that Licari should contact law enforcement.  Williams also told Licari to have law enforcement put Williams's name down as the chief complainant on the case report.

## C.    Law Enforcement's Investigation

Late in the afternoon on Thursday, February, 26th, law enforcement received a call about Lozada's threats.  Deputy Wilson went to the store with at least one other sheriff's deputy.  Licari told Wilson that several employees had approached him to report that Lozada was planning to shoot up the store and kill himself if he

5

did not get what he wanted by Saturday. On a sheriff's office form, Licari wrote out a statement for Wilson summarizing what he had heard from the employees. The words "Baker Act" appear handwritten in a box marked "Offense" above Licari's statement. Osceola Cty. Sheriff's Office Statement, Doc. 33-2 at 91. Following Licari's instruction, Licari asked to have Williams named as chief complainant, but Licari was named instead because Williams was located outside Florida. One of the deputies said he would go speak with Lozada and assess Lozada's mental state to determine if he was a threat to himself or others. The deputies told Licari they could not tell Lozada he was fired. But they would contact Licari to let him know if Lozada was detained under the Baker Act. Licari did not ask that Lozada be detained.

Wilson left the store and visited Lozada at the hotel where he was living. He spoke with Lozada about his troubles at Hobby Lobby and determined that Lozada should be detained under the Baker Act. Lozada was detained and brought to a mental health treatment facility, where he remained for approximately 36 hours before being released.

### D.    Procedural History

Lozada filed this case in Florida state court, and Hobby Lobby removed it to federal district court. The parties proceeded to discovery. Lozada testified that he never made any threats against the store. He had, however, spoken with

6

Dendariarina about the bad culture at the Kissimmee store, the gossiping and favoritism there, and about how the manager had lied to him. Once while discussing the store's bad culture, Lozada brought up recent shootings and remarked that it would be crazy if somebody took out his frustration on the store that way. Lozada acknowledged that Dendariarina may have said that Lozada threatened the store because Dendariarina misinterpreted this conversation. But Lozada also said that Dendariarina might have reported him because Dendariarina was jealous or fighting for position, as was common at the store.

The Hobby Lobby employees testified consistently with their written statements. Licari believed the statement he gave Wilson to be true. He felt at the time that his life was in danger, and he knew from speaking with Lozada that Lozada owned a firearm. Licari did not believe that Cozzens, Crupi, or Dendariarina was lying. He observed that Cozzens appeared fearful when writing out her statement.

In her deposition, Crupi added context to the period leading up to Lozada's civil commitment. In the months prior to the events of this case, Lozada told Crupi several times that "[i]f they d[id]n't make [him] a full-time, they're not going to like what they see." Crupi Dep. 14–15, Doc. 35-1. Then, on Monday, February 23rd, Crupi observed that Lozada was very upset at being sent home early when he expected to work until closing. Lozada said he was "sick of this," "[t]hey're not

going to like what they see," and "they just need to watch out." *Id.* at 12, 14. Crupi was unsure how to interpret this remark at the time but thought that Lozada might be preparing to start a physical altercation with one of the managers. Crupi also explained that Lozada and Dendariarina spoke frequently and that Dendariarina often tried to make Lozada feel better. After Lozada was sent home on Monday, Crupi asked Dendariarina how Lozada was doing, and Dendariarina, who had spoken to Lozada on the phone, replied that Lozada was upset and mad and "it was just like pure anger that was spewing out." *Id.* at 13. After work on Tuesday, Dendariarina followed up on this earlier conversation by mentioning the threats that Lozada had made. Crupi characterized this conversation with Cozzens and Dendariarina about Lozada's temper as gossip. Crupi confirmed Licari's account of how the investigation proceeded from there. She also testified that Dellofano informed her on Thursday that law enforcement would detain Lozada for 72 hours once they found him.

Deputy Wilson testified about his investigation and Lozda's detention. When Lozada questioned him about whether his investigation would have proceeded differently if he had known that only one employee had approached the store's management about Lozada's threats, Wilson refused to speculate.

After the parties concluded discovery, Hobby Lobby moved for summary judgment. The district court granted the motion. This is Lozada's appeal.

8

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment to Hobby Lobby *de novo*, applying the same legal standards used by the district court. *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). We view the evidence and all reasonable inferences from the evidence in the light most favorable to Lozada and resolve all reasonable doubts about the facts in his favor. *Id.* Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Mere speculation is insufficient to create a genuine issue of material fact. *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## III.    DISCUSSION

### A.    Dendariarina's Statement to Cozzens and Crupi Was Not Attributable to Hobby Lobby.

Hobby Lobby was entitled to summary judgment on Lozada's defamation claims based on Dendariarina's statement to Cozzens and Crupi because under Florida law, the statement could not be attributed to Hobby Lobby. Lozada contends that the district court ignored Hobby Lobby's burden of proof and failed to draw all reasonable inferences in Lozada's favor. We disagree and affirm the district court's grant of summary judgment.

Dendariarina's statement that Lozada intended to shoot up the Kissimmee store could only be attributed to Hobby Lobby if Dendariarina made that statement

9

within the scope of his employment. Defamation is an intentional tort. *See Rowell v. Holt*, 850 So. 2d 474, 478 n.1 (Fla. 2003). An employer generally is not liable for a tort committed by its employee. *See City of Miami v. Simpson*, 172 So.2d 435, 437 (Fla. 1965). That employer becomes liable, however, if it authorized the tort or if the employee committed the tort while acting within the real or apparent scope of his employment. *See Life Ins. Co. of N. Am. v. Del Aguila*, 417 So. 2d 651, 652 (Fla. 1982); *Simpson*, 172 So. 2d at 437. Lozada does not contend that Hobby Lobby authorized Dendariarina to defame him, so Dendariarina's statement could only be attributed to Hobby Lobby if Dendariarina made it within the scope of his employment.

Dendariarina did not make his statement about Lozada's plan within the scope of his employment. "Under Florida law, an employee acts within the scope of his employment 'if his act is of the kind he is employed to perform, it occurs substantially within the time and space limits of employment and it is activated at least in part by a purpose to serve the master.'" *Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992) (quoting *Kane Furniture Corp. v. Miranda*, 506 So. 2d 1061, 1067 (Fla Dist. Ct. App. 1987)). "The purpose of the employee's act, rather than the method of performance thereof, is said to be the important consideration." *McGhee v. Volusia Cty.*, 679 So. 2d 729, 732 (Fla. 1996) (citation omitted). "The question as to whether or not [an] employee is acting within the scope of his

10

employment in a particular instance is a question of law for the court if there is no conflict in the facts." *Johnson v. Gulf Life Ins. Co.*, 429 So. 2d 744, 746 (Fla. Dist. Ct. App. 1983).

The undisputed facts of this case support the district court's determination that Dendariarina did not make his statement about Lozada for the purpose of serving Hobby Lobby. First, the context in which Dendariarina made the statement suggested a personal motive. The conversation during which Dendariarina spoke about Lozada took place in the parking lot, after work, as Dendariarina and his co-workers were about to leave for the evening. Crupi characterized the conversation as gossip about Lozada's temper. Cozzens explained that Dendariarina made his statement in response to her talking about "how negative [Lozada] was being." Cozzens Statement, Doc. 33-17 at 8. Lozada testified that gossiping was a problem at Hobby Lobby. He singled out Cozzens as one who "loved to gossip." Lozada Dep. 53, Doc. 33-1. This context suggests that Dendariarina had nothing other than a personal motive—gossiping with coworkers—for making his statement about Lozada.

Second, Dendariarina's failure to report Lozada's comments to Hobby Lobby's management supported the determination that he was not acting for the purpose of serving the company. Dendariarina wrote in his statement for Hobby Lobby that Lozada had been expressing his anger against the store for about a

11

month.  Yet, during that month, Dendariarina never approached store management. And when Dendariarina finally chose to speak about Lozada, he did so to co-workers rather than management, even though Hobby Lobby's employee handbook directed him to express any job related concerns to a superior.  *See* Emp. Handbook 10, Doc. 33-10 at 7 ("Employees are encouraged to discuss any concerns with their immediate supervisor, other members of management, or the Company's Human Resources Department."); *id.* at 12, Doc. 33-10 at 9 ("If an employee has any problem relating to his/her job, the employee should promptly and frankly discuss it with his/her supervisor.").  The handbook also required that Dendariarina report comments inappropriate for the workplace to a higher-up.  *See id.* at 30, Doc. 33-12 at 7 ("If an employee feels that he/she has been subjected to Inappropriate Conduct . . . he/she must immediately report the conduct to his/her supervisor, OR any other appropriate member of management . . . ."); *id.* at 29, Doc. 33-12 at 6 (defining "Inappropriate Conduct" to include "comments or actions that are inappropriate for the workplace [or] disrupt and/or interfere with work performance").  But the undisputed evidence showed that Dendariarina did not speak to Hobby Lobby's management about Lozada until two days after speaking with his co-workers, and even then only after he was questioned by management.

12

Lozada contends that Dendariarina made his statement about Lozada at least in part for the purpose of serving Hobby Lobby. He offers three arguments. First, Lozada insists that Hobby Lobby failed to establish that Dendariarina acted solely from personal motives, so the burden did not shift to Lozada to point out a genuine dispute of material fact about Dendariarina's motives. We disagree based on the evidence we discussed above. Second, Lozada points to his own testimony as evidence that Dendariarina may have erroneously interpreted Lozada's statements as a threat and therefore been motivated by a "reckless concern for the safety of himself and his coworkers." Appellant's Br. 16. Although Lozada testified that Dendariarina may have misinterpreted a conversation between them, the only motive he ascribed to Dendariarina was "jealous[y] or fighting for a position." Lozada Dep. 49, Doc. 33-1. Both jealousy and angling for position would be entirely personal motives rather than for the purpose of serving Hobby Lobby. Third, Lozada asserts that the most natural inference from the record evidence as a whole was that Dendariarina perceived a threat to himself and his fellow employees and communicated it in the interest of the safety of the Kissimmee store. In effect, Lozada argues for a rule that every employee who makes a statement to a co-worker about another co-worker's alleged workplace threat automatically does so for the purpose of serving their employer. While that may often be the case, we disagree that workplace safety motivated Dendariarina here

13

in light of all the evidence pointing to a personal motive.  On this record, the inference Lozada asks us to draw is too speculative to withstand summary judgment.  *See Cordoba*, 419 F.3d at 1181.  Because there was no dispute of material fact as to Dendariarina's motivation for making his statement about Lozada to Crupi and Cozzens, the district court properly concluded that Dendariarina did not make that statement within the scope of his employment by Hobby Lobby.  We therefore affirm the district court's grant of summary judgment to Hobby Lobby on Lozada's defamation claim based on Dendariarina's statement to Cozzens and Crupi.[4]

## B.    Hobby Lobby's Statements Were Protected by Qualified Privilege.

Summary judgment for Hobby Lobby on Lozada's remaining defamation claims against the company was appropriate because even assuming the statements attributable to Hobby Lobby were defamatory, those statements were protected by qualified privilege.  Florida law provides that some defamatory statements are protected by privilege.  *See, e.g.*, *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla 1984).  There are two types of privilege applicable to defamation claims:  absolute

---

[4] The district court also determined that Dendariarina was acting outside the scope of his employment based on where and when Dendariarina made his statement.  Lozada makes several persuasive arguments challenging the district court's reasoning.  We need not review the court's determination, however, because our conclusion that Dendariarina did not act with the purpose of serving Hobby Lobby is sufficient to affirm the district court's grant of summary judgment.

14

and qualified. *See Fridovich v. Fridovich*, 598 So. 2d 65, 66–69 (Fla. 1992). In

*Nodar*, the Supreme Court of Florida explained qualified privilege as follows:

> A communication made in good faith on any subject matter by one
> having an interest therein, or in reference to which he has a duty, is
> privileged if made to a person having a corresponding interest or duty,
> even though it contains matter which would otherwise be actionable,
> and though the duty is not a legal one but only a moral or social
> obligation.

462 So. 2d at 809. A plaintiff can nevertheless overcome a defendant's qualified

privilege by establishing that the defendant acted with express malice in making

the defamatory statements. *See Fridovich*, 598 So. 2d at 69.

A defendant acts with express malice in making defamatory statements

when his "primary motive in making the statements [is] the intent to injure the

reputation of the plaintiff." *Id.* "If the occasion of the communication is

privileged because of a proper interest to be protected, and the defamer is

motivated by a desire to protect that interest, he does not forfeit the privilege

merely because he also in fact feels hostility or ill will toward the plaintiff."

*Nodar*, 462 So. 2d at 811–12. Indeed, "[s]trong, angry, or intemperate words do

not alone show express malice; rather, there must be a showing that the speaker

used his privileged position to gratify his malevolence." *Id.* at 811 (internal

quotation marks omitted).

The allegedly defamatory statements attributable to Hobby Lobby in this

case were protected by qualified privilege. "Where the circumstances surrounding

15

a defamatory communication are undisputed, or are so clear under the evidence as to be unquestionable, then the question of whether the occasion upon which they were spoken was privileged is a question of law to be decided by the court." *Id.* at 810. Here, the undisputed evidence established that two statements made by Hobby Lobby employees and attributable to the company, Licari's statement to law enforcement and Dendariarina's statements to his managers, were qualifiedly privileged and made without express malice. We examine each of these statements in turn.

### 1.    Licari's Statement to Law Enforcement Was Privileged.

The district court did not err in granting summary judgment to Hobby Lobby on Lozada's defamation claim that was based on Licari's statement to the sheriff's deputies. The undisputed facts demonstrated that this statement was qualifiedly privileged and that Licari did not make it with express malice. On appeal, Lozada identifies two misrepresentations[5] in Licari's statement: (1) the number of employees who heard Lozada threaten the store, and (2) the imminent nature of Lozada's threat. Lozada alleges these misrepresentations were made recklessly, and contends that such reckless misrepresentations overcome qualified privilege

---

[5] Lozada identified other alleged misrepresentations before the district court. But he neither identifies them nor makes any arguments about them on appeal. He has therefore abandoned any claims based on those misrepresentations. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (holding issues not adequately briefed on appeal are abandoned).

16

under Florida law.  Even if Lozada's interpretation of the law is correct, however, neither of Licari's alleged misrepresentations evinced any recklessness on his part. We therefore affirm.

> Licari wrote about Lozada's threat in his statement to the deputies:
>
> I was approached by some employees about threats that were made by Ismael Lozada (Izzy) that he was gonna shoot up the store and kill himself if he didn't get what he wants.  Izzy was stating if he didn't get what he wants this Saturday . . . . Izzy has told me he has a full concealed carry permit and he Izzy has worked as a armed security guard which he has told me.  He has shown employees pictures of his firearms.

Osceola Cty. Sheriff's Office Statement, Doc. 33-2 at 91.  Assuming this statement was defamatory, "defamatory statements voluntarily made by [a] private individual[] to the police . . . prior to the institution of criminal charges are presumptively qualifiedly privileged." *Fridovich*, 598 So. 2d at 69.  Lozada does not contest that Licari's statement was voluntary, that he was a private individual, or that he made his statement to law enforcement prior to the institution of criminal charges.  Licari's statement thus was presumptively privileged.

There is no evidence that Licari acted with express malice in making his statement.  To the contrary, the evidence demonstrated that Licari believed the statement he provided to law enforcement to be true.  He observed Cozzens to be fearful when writing her statement, and he believed she was reporting in good faith what she had heard.  Licari also believed Dendariarina was truthful.  And Crupi,

17

whom he also believed, confirmed that Lozada was upset about the full-time/part-time status situation.  Licari knew Lozada owned a firearm, and at the time Licari spoke with law enforcement, Licari felt that his life was in danger.  None of this evidence even hinted that Licari's "primary motive in making his statements was the intent to injure [Lozada's] reputation," as was required to find express malice. *Id.*  Because Licari's statement was qualifiedly privileged and made without express malice, the district court properly determined that Lozada's defamation claim based on the statement must be dismissed.

Lozada argues that Licari's statement to law enforcement was not privileged based on a recent Supreme Court of Florida decision.  *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1 (Fla. 2016).  He cites *Valladares* as standing for the proposition that reckless misrepresentations to law enforcement overcome qualified privilege.  This case is relevant, Lozada contends, because the misrepresentations in Licari's statement provide enough evidence to suggest recklessness and therefore preclude summary judgment.  We do not find this argument persuasive.

The Supreme Court of Florida recognized in *Valladares* that reckless misrepresentations to law enforcement may overcome qualified privilege, *id.* at 12, but it did so in the context of a cause of action for negligent reports to law enforcement rather than the intentional tort of defamation.  *Id.* at 7.  The court

18

called it "critical [to] recognize and maintain a real, meaningful distinction between intentional torts, malicious prosecution, false arrest, and negligent acts arising from conduct in" the context of false reports to law enforcement. *Id.* We therefore doubt that *Valladares* altered the express malice requirement for overcoming qualified privilege in the defamation context. We need not answer this question of Florida law, however, because there was no evidence that Licari acted recklessly in making his statement to law enforcement.

To the extent that Licari made any misrepresentations to law enforcement, they did not amount to recklessness. Recklessness in this context means "negligence . . . of a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects . . . or a grossly careless disregard of the safety and welfare of the public." *Id.* at 11 (internal quotation marks omitted). The facts of *Valladares* are instructive. There, a bank teller falsely identified plaintiff Rodolfo Valladares as a bank robber police were searching for. *Id.* at 2. Valladares differed from the robber in both appearance and ethnicity, but the teller nevertheless pushed her silent alarm as Valladares approached her to cash a check. *Id.* Valladares handed the teller the check and his identification, and he waited at the counter for 15 to 20 minutes as the teller made excuses to delay him. *Id.* at 2–3. Eventually, Valladares gave up on cashing his check and attempted to leave the bank. *Id.* at 3–4. But police

19

officers arrived, and another bank employee pointed to Valladares as the robber. *Id.* at 4. Valladares was injured severely when an officer kicked him in the head. *Id.* The Supreme Court of Florida concluded that the bank employees' behavior constituted reckless, culpable conduct that they knew or should have known would result in harm to others. *Id.* at 12.

Neither of the two alleged misrepresentations Lozada identifies in Licari's statement approached the recklessness displayed in *Valladares*. First, Lozada argues that Licari's statement that he "was *approached* by *some* employees about threats that were made by [Lozada]" was false because only one employee, Cozzens, had approached Licari and using the word "some" implied that more than one employee heard Lozada threaten to commit violence. Appellant's Br. 21 (quoting Doc. 33-2:91). Although only Cozzens sought out the store's managers[6] and only Dendariarina heard Lozada's alleged threats, there is no indication that writing "some employees" instead of "an employee" was so significant as to evince a reckless disregard for human life. Lozada even asked Wilson at his deposition whether Wilson's investigation would have proceeded differently if he knew that only one employee had approached management "about some rumor or gossip they had heard from another employee about what that employee had heard from [Lozada]." Wilson Dep. 23, Doc. 33-3. Wilson refused to speculate. *Id.* So

---

[6] The record reflects that the store's managers initiated the conversations with Crupi and Dendariarina.

do we. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) ("[S]peculation [is] insufficient to create a genuine issue of material fact.").

Second, Lozada insists that Licari misrepresented the imminent nature of Lozada's threat. According to Lozada, Licari's statement that Lozada would shoot up the store if he did not get what he wanted by the coming Saturday was misleading because Dendariarina—the only one who heard Lozada's threats—did not include that information in the written statement Licari reviewed. Lozada claims that the imminent nature of the threat was relevant to law enforcement's decision to detain him because detention under the Baker Act requires "a substantial likelihood that . . . [a] person will cause serious bodily harm to himself or herself or others *in the near future*." Fla. Stat. § 394.463(1)(b)2 (emphasis added). As such, Lozada asserts that Licari's misrepresentation was reckless. Yet it does not seem that Licari made such a misrepresentation. Dendariarina verbally informed Licari about the Saturday threat. Dellofano, who was present at the meeting between Dendariarina and Licari testified as much, and Lozada points to no contrary evidence. But even if Licari did not learn about the significance of Saturday from Dendariarina, Cozzens mentioned it in her written statement, and Crupi mentioned it when Licari interviewed her. So, at worst, Licari's misrepresentation was the implication that he heard about the Saturday deadline from the same person who heard Lozada's initial threat instead of through an

21

intermediary.  Even if this was a misrepresentation, it was not so reckless as to overcome Hobby Lobby's qualified privilege.

Licari's statement to law enforcement was protected by qualified privilege, and there was no evidence that Licari acted with express malice sufficient to overcome that privilege.  The *Valladares* case is inapposite because neither of Licari's alleged misrepresentations was reckless.  We therefore affirm the district court's grant of summary judgment to Hobby Lobby on Lozada's defamation claim that is based on Licari's statement to law enforcement.

2.    Dendariarina's Statements to His Managers Were Privileged.

The district court also properly granted summary judgment to Hobby Lobby on Lozada's defamation claim based on Dendariarina's statement to his managers.[7] This claim was based on both the oral statement Dendariarina made to Licari and Dellofano and the written statement he provided at Licari's request.  The district court concluded that qualified privilege applied to Dendariarina's statements to his managers, and Lozada does not challenge this conclusion.  Instead, Lozada argues that Dendariarina acted with express malice, which nullified the qualified privilege.  But the undisputed evidence did not support Lozada's argument.

---

[7] In his brief, Lozada frames his argument much more broadly to encompass allegedly defamatory statements made by Cozzens and Crupi to Licari and Dellofano and by Licari to members of Hobby Lobby's upper management.  But Lozada offers support only for his contention that Dendariarina's statements to his managers were made with express malice.  We therefore consider only these statements on appeal.  *See Sapuppo*, 739 F.3d at 680–81.

22

Dendariarina did not act with express malice in making the statements about Lozada to his managers. First, even assuming Lozada never actually told Dendariarina he intended to shoot up the Kissimmee store, the evidence indicated that Dendariarina misinterpreted a series of conversations he had with Lozada. Lozada testified that he spoke with Dendariarina about the bad culture at the Kissimmee store: "how it was unpleasant to work there, the gossiping, the favoritism," and about how the manager had lied to him. Lozada Dep. 45, Doc. 33-1. While discussing the store's bad culture, Lozada once said that "because of everything that was going on in the news[,] people shooting up, you know, schools and everything that was going on, that [it] would be crazy if someone takes their frustration out like that here . . . ." *Id.* at 46–47. Lozada admitted that Dendariarina may have made the statements he did to Hobby Lobby's management because he misinterpreted this conversation about shootings. Second, Dendariarina's actions after having this conversation with Lozada did not indicate that he acted with malice. Dendariarina did not provide the statements to his managers until they called him into their office. And Dendariarina's written statement contained qualifications suggesting he was unsure of Lozada's intentions. It included that Lozada may have been speaking "out [of] anger," in which case Lozada "d[id]n't mean it," and that Dendariarina "d[id]n't think [Lozada] would do anything stupid like that," although Dendariarina added that

23

"you never [k]no[w] people's anger."  Dendariarina Statement 1, 3, Doc. 33-17 at 9, 11.  None of this evidence supported an inference that Dendariarina's "primary motive in making the statements was the intent to injure the reputation of" Lozada, as required to find express malice.  *Fridovich*, 598 So. 2d at 69.

Lozada argues that his own testimony that he did not make the alleged statements to Dendariarina is enough to establish that Dendariarina acted with express malice because it shows that Dendariarina lied knowingly when speaking to his managers.  Yet, as we explained above, Lozada's testimony established that he and Dendariarina talked about an employee shooting up the Kissimmee store and Lozada's dislike of the culture at that store, and Lozada himself acknowledged that Dendariarina may have misinterpreted this conversation.  In light of this evidence, Lozada's argument that Dendariarina made the statements to his managers primarily to injure Lozada's reputation was too speculative to survive summary judgment.  We therefore affirm the district court's grant of summary judgment to Hobby Lobby on Lozada's defamation claim that is based on Dendariarina's statements to his managers.

## C.    Hobby Lobby Did Not Instigate Lozada's Detention.

Finally, the district court properly granted summary judgment for Hobby Lobby on Lozada's false arrest claim because Hobby Lobby did not instigate his detention.  Lozada claims there is evidence that Hobby Lobby, acting through

24

Licari and Williams, procured Lozada's detention, but the evidence on which he relies merely indicates that Licari sought help from law enforcement at Williams's direction. We thus affirm the court's grant of summary judgment.

Hobby Lobby could be liable for false arrest based on Lozada's detention only if it instigated that detention.[8] Florida law provides a claim for false arrest when a defendant either directly or indirectly detains a plaintiff. *Johnson v. Weiner*, 19 So. 2d 699, 701 (Fla. 1944). In the context of a private citizen's report leading to an arrest by law enforcement, a "private citizen may not be held liable in tort where he neither actually detained another nor instigated the other's arrest by law enforcement officers." *Pokorny v. First Fed. Sav. & Loan Ass'n of Largo*, 382 So. 2d 678, 681 (Fla. 1980). Because Lozada does not contend that Hobby Lobby itself detained him, Hobby Lobby could be liable for false arrest only if it instigated his detention by law enforcement.

Hobby Lobby did not instigate Lozada's detention. "If [a] private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's arrest does not make him liable when he did not in fact request any detention." *Id.* at 682. Assuming Licari's statement about Lozada's threat was mistaken, he made that statement in

---

[8] Hobby Lobby does not deny that Licari and Williams each acted within the scope of their employment, so Hobby Lobby could be liable for false arrest based on their actions. *See Del Aguila*, 417 So. 2d at 652.

25

good faith.[9]  And he did not instigate Lozada's detention.  "To so 'instigate' an arrest, the defendant must have taken an active role in encouraging or procuring the wrongful arrest."  *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. Dist. Ct. App. 2015).  Instigation in this context "is the equivalent in words or conduct of 'Officer, arrest that man!'"  *Id.* at 531 (quoting Restatement (Second) of Torts § 45A cmt. c.) (internal quotation marks omitted).  Here, Licari, Dellofano, and Wilson each testified about the meeting at which they discussed Lozada, and all of them testified that Licari never requested that Lozada be detained.  Instead, Licari relayed to Wilson the information he learned from Dendariarina, Cozzens, and Crupi.  Wilson testified that he then visited Lozada and, after observing him, decided to detain him.  There is no evidence that Licari made any statements or took any action equivalent to urging law enforcement to arrest Lozada.  Hobby Lobby therefore did not instigate Lozada's detention.

Lozada insists that the evidence reasonably gave rise to an inference that Hobby Lobby instigated his detention.  He highlights Licari's testimony that Williams instructed Licari that "he did not want Mr. Lozada in the building anymore, [Lozada] was not going to work for Hobby Lobby anymore, and . . . [Licari] needed to call the police and get the local law enforcement involved in it."  Licari Dep. 40, Doc. 33-2.  According to Lozada, "get the local law enforcement

---

[9] As we explained above, the undisputed evidence supports the conclusion that Licari acted without malice.

involved in it" reasonably could have been a directive to have Lozada arrested.

This reading is purely speculative and runs counter to the evidence. Lozada also

points out that Williams wanted to be listed as the complainant on the statement to

law enforcement, but Lozada does not explain how this request is relevant to his

argument.[10] Lozada next argues that evidence that Licari asked Wilson to speak to

Lozada and inform him that he was fired went beyond merely reporting

information to law enforcement. Perhaps so, but it did not amount to instigation

because it was not equivalent to asking Wilson to arrest Lozada.

Finally, Lozada contends that evidence of record demonstrated that Licari

spoke with law enforcement about detaining Lozada under the Baker Act, which

reasonably gave rise to the inference that Licari requested that detention. The

evidence on which Lozada relies is Licari's request that law enforcement "contact

[him] to let [him] know if [Lozada] was backeracted [sic] which is a 72 hour

mandatory psych hold," Crupi's testimony that her managers[11] told her that law

enforcement would detain Lozada for 72 hours once they found him, and the title

"Baker Act" written in the "Offense" box over the statement Licari wrote for

---

[10] Lozada asserts that when Wilson declined to list Williams as the complainant, Williams directed Licari to become the complainant. There is no support in the record for this assertion. And in any event, the identity of the complainant is irrelevant; it is what the complainant asked law enforcement to do that matters. *See Harder*, 174 So. 3d at 531.

[11] Lozada claims that Licari made this statement to Crupi. In fact, the record establishes that Dellofano and an assistant manager informed Crupi about law enforcement's intention to detain Lozada.

Wilson. These facts reasonably give rise to the inference that Hobby Lobby employees spoke with law enforcement about detaining Lozada under the Baker Act. To the extent that inference contradicts Wilson's testimony that he did not decide to detain Lozada until after seeing him, we must accept Lozada's version of events as true. But a conversation between Hobby Lobby employees and law enforcement about detaining Lozada does not by itself reasonably give rise to the inference that Licari requested that detention. Without any evidence to that effect, we cannot agree with Lozada's argument that there is a dispute of material fact as to whether Hobby Lobby instigated his detention. We therefore affirm the district court's grant of summary judgment on this issue.

## IV.   CONCLUSION

For these reasons, the judgment of the district court is **AFFIRMED**.